559 F.2d 1063
 12 Empl. Prac. Dec. P 11,175, 14 Empl. Prac.
Dec. P 7770
Geraldine G. CANNON, Plaintiff-Appellant,
v.
The UNIVERSITY OF CHICAGO et al., Defendants-Appellees.
Geraldine G. CANNON, Plaintiff-Appellant,
v.
NORTHWESTERN UNIVERSITY et al., Defendants-Appellees.
 Nos. 76-1238, 76-1239.
 United States Court of Appeals,
Seventh Circuit.
 Argued June 4, 1976.
Decided Aug. 27, 1976.
On Rehearing Aug. 9, 1977.
 
 John M. Cannon, Chicago, Ill., for plaintiff-appellant.
 Samuel K. Skinner, U. S. Atty., Frederick H. Branding, Asst. U. S. Atty., Marvin E. Gavin, Regional Atty., Dept. of Health, Education and Welfare, and Rochell K. Stallworth, Gen. Atty., Dept. of Health, Education and Welfare, Thomas H. Morsch, Stuart Bernstein, Chicago, Ill., for defendants-appellees.
 Before SPRECHER and BAUER, Circuit Judges, and GRANT, Senior District Judge.*
 BAUER, Circuit Judge.
 
 
 1
 Plaintiff Geraldine Cannon brought this civil rights suit against defendants, the University of Chicago, Northwestern University, and various individual officers of the schools, after she was rejected as an applicant for admission to the medical schools. She alleges that she was denied admission because of her age and sex. The trial court dismissed the suit for failure to state a claim upon which relief could be granted. We affirm.
 
 
 2
 Plaintiff at the time of application was 39 years old with a bachelor's degree from Trinity College of Deerfield, Illinois. Her medical college admission test scores placed her in the lower half of the applicant group. Her undergraduate grade point average in basic science was 3.17 on a 4.00 scale.
 
 
 3
 Although the plaintiff's academic credentials were good, statistics for the 1975 entering class at the University of Chicago Pritzker School of Medicine indicate the plaintiff faced overwhelming competition; 5,427 persons applied for the 104 positions available at the medical school. In sharp contrast to plaintiff's grades, the overall average of the entering class was 3.70. The Dean of the medical school stated in an affidavit that there were at least 2,000 unsuccessful applicants who had better academic qualifications than the plaintiff.
 
 
 4
 A review of the persons who applied with plaintiff indicates that 1,172 were women and 4,154 were men. Of the 104 admitted, 19 were female and 85 were male. Over the past four years, 18.1% of the applicants to the University of Chicago Medical School has been female; over the same period, 18.3% of the entering class has been female.[1]
 
 
 5
 Despite the difficult factual setting[2] in which plaintiff found herself she brought suit alleging age and sex discrimination. The complaint alleged that her rights were violated under the Civil Rights Act of 1871, 42 U.S.C. § 1983, Title IX of the Education Amendments to the Civil Rights Act of 1964, which prohibits sex discrimination, the Age Discrimination in Employment Act, 29 U.S.C. § 621, and the Public Health Services Act, § 799A, 42 U.S.C. § 295h-9. Plaintiff also filed administrative complaints with the Department of Health, Education and Welfare ("HEW"). Later the complaint was amended naming HEW and its regional director as defendants in the suit.[3] In affirming the dismissal of the complaint we will consider each of plaintiff's jurisdictional claims individually.
 
 
 6
 I. INSUFFICIENT STATE ACTION EXISTS FOR FEDERAL JURISDICTION UNDER 42 U.S.C. S 1983.
 
 
 7
 Plaintiff's chief allegation is that the defendants' rejection of her application for admission to medical school deprived her of equal protection of the laws in violation of 42 U.S.C. § 1983.[4] The district court granted defendants' motion to dismiss for lack of subject matter jurisdiction over this claim on the ground that plaintiff had failed to meet the "state action" requirement of § 1983. In so ruling, Judge Hoffman specifically applied the standards for the "state action" requirement which have been articulated in recent years by the United States Supreme Court and by this Court.
 
 
 8
 In Moose Lodge No. 107 v. Irvis,[5] 407 U.S. 163, 173, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972), a black guest was refused service in a private club's dining room because of his race. Since the club was operating pursuant to a liquor license issued by the Pennsylvania Liquor Control Board and was subject to detailed regulations by the Pennsylvania Board, the plaintiff argued that sufficient "state action" was present to establish a violation of his Fourteenth Amendment rights.
 
 
 9
 The Court rejected the "state action" claim, observing:
 
 
 10
 "The Court has never held, of course, that discrimination by an otherwise private entity would be violative of the Equal Protection Clause if the private entity receives any sort of benefit or service at all from the State, or if it is subject to state regulation in any degree whatever. Since state-furnished services include such necessities of life as electricity, water, and police and fire protection, such a holding would utterly emasculate the distinction between private as distinguished from state conduct set forth in The Civil Rights Cases, supra, and adhered to in subsequent decisions. Our holdings indicate that where the impetus for the discrimination is private, the State must have 'significantly involved itself with invidious discriminations', Reitman v. Mulkey, 387 U.S. 369, 380 (87 S.Ct. 1627, 1634, 18 L.Ed.2d 830) (1967), in order for the discriminatory action to fall within the ambit of the constitutional prohibition." 407 U.S. at 173, 92 S.Ct. at 1971.
 
 
 11
 The requirement of state action was explained even more fully by the Supreme Court in Jackson v. Metropolitan Edison Comm., 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974). Suit was brought under § 1983 against a private utility company seeking an injunction and damages for the termination of plaintiff's electrical services without notice, a hearing, or an opportunity to pay any amounts due. The claim of state action was based upon the following allegations: (1) the State had conferred monopoly status upon the utility company; (2) the utility performed a public service required to be supplied on a continuous basis under the law, hence performing a "public function"; and (3) the State "specifically authorized and approved" the termination practice. In holding that this was insufficient for a finding of state action under § 1983, the Supreme Court outlined the relevant test:
 
 
 12
 "The mere fact that a business is subject to state regulation does not by itself convert its action into that of the State for purposes of the Fourteenth Amendment. * * * Nor does the fact that the regulation is extensive and detailed, as in the case of most public utilities, do so. Public Utilities Comm'n v. Pollak, 343 U.S. 451, 462 (72 S.Ct. 813, 820, 96 L.Ed. 1068) (1952). It may well be that acts of a heavily regulated utility with at least something of a governmentally protected monopoly will more readily be found to be 'state' acts than will the acts of an entity lacking these characteristics. But the inquiry must be whether there is a sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the State itself. Moose Lodge No. 107, supra, at 176, (92 S.Ct. at 1973)." 419 U.S. at 350-51, 95 S.Ct. at 453.
 
 
 13
 The Supreme Court has thus made clear that neither general government involvement nor even extensive detailed state regulation is sufficient for a finding of state action. Rather, the state must affirmatively support and be directly involved in the specific conduct which is being challenged.[6]
 
 
 14
 Plaintiff in this case makes an allegation that because the medical school receives money from the State its admission decisions are made differently than school administrators would otherwise decide on the basis of academic policy. We see nothing in the record to support this conclusory allegation.[7] Plaintiff argues that the giving of financial assistance by the State is tantamount to direct involvement of the State. See Weise v. Syracuse University, 522 F.2d 397 (2d Cir. 1975); Grafton v. Brooklyn Law School, 478 F.2d 1137, 1142 (2d Cir. 1973); Braden v. University of Pittsburgh, 477 F.2d 1, 6 (3d Cir. 1973); Brown v. Strickler, 422 F.2d 1000, 1001 (6th Cir. 1970); Rackin v. University of Pennsylvania, 386 F.Supp. 992, 1001 (E.D.Pa. 1974); Isaacs v. Board of Trustees of Temple University, 385 F.Supp. 473, 479 (E.D.Pa. 1974). We agree that in some situations state financial assistance can amount to state action. But in this case we do not believe that the character and amount of assistance mandates a finding of state action. As Justice Stevens (then Circuit Judge) stated in Cohen v. I. I. T., 524 F.2d 818, 825 (7th Cir. 1975):
 
 
 15
 "Two different conclusions may be drawn from the allegations relating to the State's support of I.I.T. First, it is plain that the school is not so heavily dependent on the State as to be considered the equivalent of a public university for all purposes and in all its activities. It would dramatically enlarge the state action concept to conclude that these facts are sufficient to require a complete surrender of a university's private character. . . ."
 
 
 16
 A reading of the cases indicates that the concept of state action depends not only upon the amount of state financial assistance but also upon the type of injury alleged. In this case, where there appears to be no state connection to the injury alleged, where there is no indication that the State exercises any control of the medical schools' admissions policies, it would be improper to divest the medical schools of their private character.
 
 
 17
 This Court has followed the approach outlined by the Supreme Court in requiring a "nexus" between the State and the challenged conduct in several recent decisions. For example, in Doe v. Bellin Memorial Hospital, 479 F.2d 756 (7th Cir. 1973), a doctor and a pregnant woman seeking to use a hospital's facilities for the purpose of performing an abortion filed a lawsuit against the hospital and its officials. Jurisdiction was claimed under § 1983 based on the fact that the defendant hospital had "accepted financial support . . . from both the federal (Hill-Burton Act) and state governments, . . . (was) subject to detailed regulation by the State" and "had been an agency through which the State of Wisconsin and the United States Government (had) provided medical services for residents of Northeastern Wisconsin . . . ." 479 F.2d at 758, 761.
 
 
 18
 The Court rejected the claim of § 1983 jurisdiction, finding that the " record (did) not reflect any governmental involvement in the very activity . . . being challenged." Id. at 761. The Court made clear that the governmental involvement necessary to meet the "state action" requirement under § 1983 must be "affirmative support" measured by its direct contribution to the conduct at issue. Such affirmative support was lacking in Doe, the Court held, as "there (was) no claim that the state (had) sought to influence hospital policy respecting abortions, either by direct regulation or by discriminatory application of its powers or its benefits." In sum, the Court concluded:
 
 
 19
 "The facts that defendants have accepted financial support, as alleged, from both the federal and state governments, and that the hospital is subject to detailed regulations by the State, do not justify the conclusion that its conduct, which is unaffected by such support or such regulation, is governed by § 1983." Id. at 761.
 
 
 20
 See also Driscoll v. International Union of Operating Engineers, Local 139, 484 F.2d 682, 690 (7th Cir. 1973), cert. denied 415 U.S. 960, 94 S.Ct. 1490, 39 L.Ed.2d 375 (1974) ("To be regulable under constitutional standards through § 1331 or § 1983, the very activity of a private entity which a plaintiff challenges must be supported by state action that significantly fosters or encourages that activity."); Lucas v. Wisconsin Electric Company, 466 F.2d 638, 654-56 (7th Cir. 1972) (en banc), cert. denied 409 U.S. 1114, 93 S.Ct. 928, 34 L.Ed.2d 696 (1973); Bright v. Isenbarger, 445 F.2d 412 (7th Cir. 1971) (per curiam).
 
 
 21
 Finally, this Court's recent decision in Cohen v. Illinois Institute of Technology, supra, is fully dispositive of plaintiff's § 1983 claim here. There, a female assistant professor brought suit under § 1983 against I.I.T. and some of its officers alleging that the university had discriminated against her in appointment, retention, and compensation on account of her sex. The district court dismissed the § 1983 claim because I.I.T. is not a state school and plaintiff had not shown state involvement in the personnel practices which she challenged. 384 F.Supp. 202 (N.D.Ill. 1974).
 
 
 22
 This Court affirmed the dismissal, stating:
 
 
 23
 "To support the proposition that the defendants acted under color of state law, plaintiff has made detailed allegations which may be considered in four parts: first, by using the word 'Illinois' in its name, I.I.T. has, in effect, held itself out as a state instrumentality; second, I.I.T. has received financial and other support from the state; third, I.I.T. is pervasively regulated by the state; and fourth, it has failed to take affirmative action to prevent I.I.T. from using gender as a criterion for faculty compensation and promotion. The complaint, however, contains no allegation that any State instrumentality has affirmatively supported or expressly approved any discriminatory act or policy, or even had actual knowledge of any such discrimination.
 
 
 24
 (T)here is no allegation in the complaint that the various forms of assistance given to I.I.T., or to its students, by the State, have had any impact whatsoever on the ability of Dr. Cohen, or any other member of her sex, to be treated impartially by the administration of the Institute. The State has lent significant support to I.I.T.; it is not, however, alleged to have lent any support to any act of discrimination." 524 F.2d at 825-826 (footnotes omitted).
 
 
 25
 See also, Greco v. Orange Memorial Hospital Corp., 513 F.2d 873, 880 (5th Cir. 1975); Ascherman v. Presbyterian Hospital of Pacific Medical Center, Inc., 507 F.2d 1103, 1105 (9th Cir. 1974); Ward v. St. Anthony Hospital, 476 F.2d 671, 674-75 (10th Cir. 1973); Blackburn v. Fisk University, 443 F.2d 121, 124 (6th Cir. 1971).
 
 
 26
 In this case all that plaintiff alleges is the receipt of state and federal financial assistance.[8] But, even assuming financial aid and assistance by the State in whatever amounts, such aid and assistance is insufficient for jurisdiction under § 1983 unless it can be shown that the State has "affirmatively supported" the particular conduct challenged here.
 
 
 27
 Plaintiff asserts that her mere allegation of "particularly offensive discrimination in violation of national policy" obviates the requirement that there be a nexus between the State and the challenged activity. We cannot subscribe to such a position, for Moose Lodge itself, which articulated the nexus requirement, involved race discrimination which is obviously both offensive and in violation of national policy. Moreover, Cohen also involved the issue of sex discrimination, yet this Court was clear in its requirement that detailed state regulation is not enough unless the "regulatory agency has encouraged the practice in question, or at least given its affirmative approval to the practice." 524 F.2d at 826.
 
 
 28
 II. TITLE IX DOES NOT PROVIDE FOR A PRIVATE RIGHT OF ACTION IN THIS SITUATION.
 
 
 29
 Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, et seq., prohibits discrimination based on sex in most educational institutions receiving federal financial assistance. Title IX states:
 
 
 30
 "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."
 
 
 31
 Plaintiff maintains that Title IX provides an independent basis of federal jurisdiction for her action. On the other hand, the defendants claim that Title IX does not provide an independent cause of action in federal court, but rather, provides for mandatory administrative procedures followed only then by judicial review.
 
 
 32
 The question, we believe, is one of first impression.[9] Consequently we must look to the intent of Congress, as well as the experience of the courts in dealing with similar statutes.
 
 
 33
 Plaintiffs rely heavily upon previous decisions based upon Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, et seq., the language[10] of which is identical to Title IX except that it bars racial discrimination. But our reading of the cases does not indicate that Title VI provides a private right of action for each individual discriminatee. Those cases involved an attempt by a large number of plaintiffs to enforce a national constitutional right. See Lau v. Nichols, 414 U.S. 563, 94 S.Ct. 786, 39 L.Ed.2d 1 (1974); Bossier Parish School Board v. Lemon, 370 F.2d 847 (5th Cir. 1967). Justice Blackmun in his opinion in Lau warned against an overly broad reading of the case, stating:
 
 
 34
 "I stress the fact that the children with whom we are concerned here number about 1,800. This is a very substantial group that is being deprived of any meaningful schooling because the children cannot understand the language of the classroom . . .
 
 
 35
 (If) we (were) concerned . . . with just a single child, . . . I would not regard today's decision . . . as conclusive. . . ." 414 U.S. at 571-72, 94 S.Ct. at 791.
 
 
 36
 The limitations of Lau were adopted by the Tenth Circuit in Serna v. Portales Municipal Schools, 499 F.2d 1147, 1154 (10th Cir. 1974), when the Court noted:
 
 
 37
 "As Mr. Justice Blackmun pointed out in his concurring opinion in Lau, numbers are at the heart of this case and only when a substantial group is being deprived of a meaningful education will a Title VI violation exist."
 
 
 38
 It appears that Lau and Bossier were desegregation cases involving attempts to deprive large groups of minorities of their right to equal educational opportunities. But they simply do not give any real support to plaintiff's argument that we must infer an individual right of action under Title IX in favor of a person who has a grievance based upon sexual discrimination against a private educational institution receiving government funds.
 
 
 39
 Admittedly the courts have implied private causes of action under statutes which were silent as to the existence of a judicial remedy.[11] However, in this instance, construing Title IX to provide a private cause of action before the administrative remedy has been exhausted would be to violate the intent of Congress.
 
 
 40
 In enacting Title IX Congress established a scheme through which its prohibition against sex discrimination would be enforced by HEW, the administrative agency empowered to extend the federal aid. The statute encourages voluntary compliance in the first instance, an opportunity for an administrative hearing on the issue of discrimination if necessary, and the withdrawal of federal funds as a last resort for a recalcitrant institution which has been found to discriminate in violation of the Act.[12] After department or agency action, there is a right to judicial review.[13]
 
 
 41
 It is clear that no individual right of action can be inferred from Title IX in the face of the carefully constructed scheme of administrative enforcement contained in the Act. As the United States Supreme Court stated in National Railroad Passenger Corp. (Amtrak) v. National Ass'n. of Railroad Passengers, 414 U.S. 453, 458, 94 S.Ct. 690, 693, 38 L.Ed.2d 646 (1974), while refusing to infer a private cause of action from the Rail Passenger Service Act of 1970:
 
 
 42
 "A frequently stated principle of statutory construction is that when legislation expressly provides a particular remedy or remedies, courts should not expand the coverage of the statute to subsume other remedies. 'When a statute limits a thing to be done in a particular mode, it includes the negative of any other mode.' Botany Worsted Mills v. United States, 278 U.S. 282, 289, 49 S.Ct. 129, 132, 73 L.Ed. 379 (1929)."
 
 
 43
 In Securities Investor Protection Corp. v. Barbour, 421 U.S. 412, 95 S.Ct. 1733, 44 L.Ed.2d 263 (1975), the Supreme Court held that the Securities Investor Protection Act of 1970, which established a nonprofit corporation, SIPC, to provide financial relief to customers of failing broker-dealers, did not create a private right of action for such customers to compel SIPC to exercise its statutory authority for their benefit. Following Amtrak, the Court stated as follows:
 
 
 44
 "The respondent contends that since the SIPC does not in terms preclude a private cause of action at the instance of a member broker's customers, and since such customers are the intended beneficiaries of the Act, the Court should imply a right of action by which customers can compel the SIPC to discharge its obligations to them. As we said only last Term in analyzing a similar contention, 'It goes without saying . . . that the inference of such a private cause of action not otherwise authorized by the statute must be consistent with the evident legislative intent and, of course, with the effectuation of the purposes intended to be served by the Act.' National Railroad Passenger Corp. v. National Association of Railroad Passengers, 414 U.S. 453 (457-58, 94 S.Ct. 690, 38 L.Ed.2d 646) (1974)."
 
 
 45
 In Cort v. Ash, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 416 (1975), the Supreme Court held that a private right of action could not be implied by a shareholder under 18 U.S.C. § 610, which prohibits corporations from making contributions or expenditures in connection with certain federal elections. The Court based its decision in part on the absence of any evidence that Congress had intended a private right of action for violations of the statute. 422 U.S. at 82-83, 95 S.Ct. 2080.
 
 
 46
 The teaching of Amtrak, SIPC and Cort, supra, is that a private cause of action should not be lightly implied under a statute where Congress has not specifically provided one especially where Congress has provided for other means of enforcement.[14]
 
 
 47
 The Congressional history of Title IV leaves no doubt that our legislators were quite concerned about women being placed in an unequal position in seeking admission to institutions of higher learning. 1972 U.S.Code Cong. and Admin. News 2462, 2512. But the Congressional reports also indicate that many of the legislators believed that attempts at ending sexual discrimination were better achieved on a voluntary basis rather than by additional governmental regulation. Apparently none of the Congressmen envisioned the rather drastic remedy of individual lawsuits.[15] None of the reports mention the fact that a private cause of action might be implied under Title IX.
 
 
 48
 From a policy viewpoint we see little to be gained by involving the judiciary in every individual act of discrimination based upon sex. Perhaps our resources would be better spent in litigation challenging wholesale sexual discrimination against a large number of men or women by a particular educational institution.[16] Title VI has been effectively employed in this fashion, and we see no reason why Title IX would not provide a similar jurisdictional base for those cases where the administrative abilities of HEW would be inundated or inadequate. However, for the day-to-day problems, stemming from the long overdue social revolution in equality of the sexes, we think the HEW administrative procedure is best.[17] Although some commentators[18] have taken the view that working through HEW is painstakingly show and ineffective,[19] we fail to see how a private lawsuit by individual parties would facilitate an end to sex discrimination. To allow a private right of action would be engaging in judicial legislation. Considering our already overburdened system we fail to see why we should stretch a statute by judicial interpretation to the point where it would allow additional litigation which we may not be able to properly accommodate.
 
 
 49
 III. THE AGE DISCRIMINATION IN EMPLOYMENT ACT IS NOT APPLICABLE TO THIS CASE.
 
 
 50
 Plaintiff also seeks to claim jurisdiction for this suit under the Age Discrimination Employment Act of 1967, 29 U.S.C. § 621 et seq.[20] Her amended complaint contends that the denial of admission to medical school has the effect of barring her from securing employment as a doctor of medicine. In addition to sexual discrimination, she claims that she was denied admission because of her age.[21]
 
 
 51
 Plaintiff argues that each defendant medical school functions as an employment agency in regularly undertaking to procure doctors as employees for their university hospitals.
 
 
 52
 The term employment agency, as defined in 29 U.S.C. § 630(c),[22] means any person regularly undertaking with or without compensation to procure employees for employers and includes an agent of such person. Litigation concerning the meaning of the term employment agency is rather sparse and primarily has been confined to cases arising under a very similar definition of the term under Title VII, 42 U.S.C. § 2000e(c),[23] but generally it has been held to include "only those engaged to a significant degree in that kind of activity as their profession or business." Brush v. San Francisco Newspaper Printing Co., 315 F.Supp. 577, 580 (N.D.Cal. 1970), aff'd, 469 F.2d 89 (9th Cir. 1972), cert. denied 410 U.S. 943, 93 S.Ct. 1369, 35 L.Ed.2d 609. See also Greenfield v. Field Enterprises, 4 Fair Employment Practice Cases 548 (N.D.Ill. 1972).
 
 
 53
 In Greenfield, a Title VII case, the court stated that "the act clearly defines the activities of an employment agency in the traditional and generally accepted sense of that term. . . . Nothing in the statute or legislative history suggest a broader or different meaning." Id. at 550. However, in a recent decision, Kaplowitz v. University of Chicago, 387 F.Supp. 42 (N.D.Ill. 1974), the district court acknowledged that a liberal construction of the term employment agency was required to best effectuate the purposes of Title VII, and found that the University of Chicago Law School was significantly involved in operating allegedly discriminatory placement facilities, stressing the importance to the school of finding employment for its graduates.[24]
 
 
 54
 Taking plaintiff's allegations as true and further assuming for purposes of argument a liberal construction of the term employment agency holding that the defendants do operate employment agencies, we nevertheless agree with the district court that the complaint fails to allege age discrimination in connection with employment.
 
 
 55
 Plaintiff is seeking admission to the defendant schools as a medical student, not as an individual seeking employment through the schools. Plaintiff admits that the defendants have not failed or refused to refer her for employment on the basis of her age. The purpose of the Act is to provide employment opportunities and hiring for persons between the ages of 40 and 65 without discrimination based on age. This purpose was based upon the finding that older workers found themselves disadvantaged in their efforts to retain or regain employment after being dismissed from their jobs. Nothing in the statute nor the legislative history suggests a broader interpretation. In order for an individual to state a claim under the Act, that individual must be qualified to accept employment and only then have been discriminated against on the basis of age. Plaintiff's claim is too remote she has not successfully completed the necessary prerequisites to be in a position to fall within the protection of the Act. Her complaint merely amounts to an allegation of discrimination in admission to a university and fails to state anything beyond a remote connection to discrimination in employment. As such, the complaint fails to state a claim under the Age Discrimination in Employment Act of 1967.
 
 
 56
 We also note that procedurally plaintiff has failed to comply with the Age Discrimination in Employment Act. The Act authorizes a civil action only after giving notice to the Secretary of Labor sixty days before the suit is filed under 29 U.S.C. § 626(d).[25] The purpose of this requirement is to allow the Secretary an opportunity "to eliminate any alleged unlawful practice by informal methods of conciliation, conference, and persuasion." There is no indication in the record that plaintiff has complied with this jurisdictional prerequisite. Therefore, even if we accepted plaintiff's argument that a valid cause of action existed under the Act, we would still have to dismiss for want to jurisdiction.
 
 
 57
 IV. JURISDICTION DOES NOT EXIST UNDER THE PUBLIC HEALTH SERVICES ACT OR THE ADMINISTRATIVE PROCEDURE ACT.
 
 
 58
 Section 799A of the Public Health Services Act[26] provides that the Secretary of HEW may not give financial assistance to schools which discriminate on the basis of sex. Plaintiff claims that this statute gives her the right to maintain a private right of action against the medical schools as a third party beneficiary under the Act. Although Section 799A does not provide for a private cause of action, there have been some situations in which the courts have allowed a suit to go forward under an implied right theory.[27]
 
 
 59
 In this case we believe that to imply jurisdiction under the Act for a private lawsuit would be improvident. This is a suit by a single plaintiff against two predominantly private institutions. In fact, should a court grant her requested relief, it would require discriminating against the 2,000 other applicants who had better qualifications than plaintiff.
 
 
 60
 Finally, plaintiff claims that jurisdiction exists under § 706 of the Administrative Procedure Act, which authorizes a court to "compel agency action unlawfully withheld or unreasonably delayed." We cannot sustain this suit on this jurisdictional basis since HEW is actively investigating plaintiff's complaint and the delay involved of about one year has not been unreasonable.
 
 
 61
 Accordingly, the decision of the district court in dismissing the complaint is hereby affirmed.
 
 
 62
 AFFIRMED.
 
 On Rehearing
 
 63
 After issuing our opinion in this case, we granted plaintiff's petition for rehearing of the issue of whether a private right of action lies under Title IX of Public Law 92-318 in the circumstances of this case.[1] We took this step principally to give the parties an opportunity to develop the question of whether the inclusion of Title IX within the provisions of the Civil Rights Attorney's Fees Award Act of 1976, Pub.L. No. 94-559, § 2, 90 Stat. 2641, requires a different resolution of the Title IX issue presented to us. Also, we were concerned that we had misconstrued the import of Lau v. Nichols, 414 U.S. 563, 94 S.Ct. 786, 39 L.Ed.2d 1 (1974), in resolving the Title IX issue against the plaintiff.
 
 
 64
 After considering the new briefs submitted by the parties, we remain convinced that no private cause of action lies under Title IX in the circumstances of this case. Accordingly, we adhere to our previous judgment affirming the district court's dismissal of plaintiff's complaint for the reasons noted below.
 
 I.
 
 65
 Shortly after our decision of the case at bar, Congress enacted the Civil Rights Attorney's Fees Award Act of 1976, Pub.L. No. 94-559, § 2, 90 Stat. 2641 (codified at 42 U.S.C.A. § 1988 (1977 Supp.)). The statute provides in relevant part:
 
 
 66
 "In any action or proceeding to enforce a provision of . . . title IX of Public Law 92-318, . . . the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs."
 
 
 67
 On rehearing, plaintiff concedes that the legislative history of the Act makes clear that the Act was not designed to create any remedies for violations of federal civil rights not already authorized under the statutes covered by the Act. E.g., Sen. Rep. No. 94-1011, 94th Cong., 2d Sess. 6 (1976), reprinted in (1976) U.S. Code Cong. & Admin. News 5913; 122 Cong. Rec. S. 16525 (daily ed. Sept. 21, 1976) (remarks of Sen. Kennedy); 122 Cong. Rec. H. 12153 (daily ed. Oct. 1, 1976) (remarks of Rep. Drinan). However, plaintiff argues that the Act's inclusion of Title IX constitutes a "most emphatic and unmistakable declaration" of Congress's understanding and intent that private suits by individuals are permitted under Title IX, for the inclusion of Title IX in the Act makes no sense unless Congress believed that private rights of action were already authorized under Title IX itself. In support of her argument, plaintiff refers us to the remarks of various members of Congress made during debates on the Attorney's Fees Award Act,[2] which suggest that at least those members of Congress assumed that private suits were permitted under all of the statutes included in the Act, including Title IX. Plaintiff would have us view those remarks as a subsequent expression of Congress's previous intent in enacting Title IX. This subsequent declaration of Congress's pre-existing intent, says plaintiff, must be given at least "great" if not " conclusive" weight in determining whether we should imply a private right of action under Title IX.[3]
 
 
 68
 Defendants answer that the Act's inclusion of Title IX could be construed as simply indicating an intent to provide for the award of attorney's fees to the prevailing party in any proceeding for judicial review of agency action already expressly provided in Title IX under 42 U.S.C. § 1683. Thus, Title IX's inclusion in the Attorney's Fees Award Act would make sense, say defendants, even if we implied no judicial cause of action on behalf of private parties. Moreover, the defendants argue, even if the Act was intended to authorize the award of attorney's fees to the prevailing party in private party litigation brought to enforce the provisions of Title IX, we should not therefore assume that Congress necessarily was expressing either an understanding that a private right of action already existed under Title IX or an intent to encourage courts to imply one; rather, Congress simply could have been providing for the contingency that future court decisions might imply a private right of action from the provisions of Title IX.
 
 
 69
 As we read the legislative history of the Attorney's Fees Award Act, it provides no support for plaintiff's argument that the inclusion of Title IX within the Act was intended to provide a private right of action under Title IX. At best, the remarks to which plaintiff has referred us suggest only that some members of Congress may have assumed that private suits were authorized under all of the statutes included within the Act. But, even if the entire Congress shared the assumption that a private right of action was authorized by Title IX, none of the precedents on which plaintiff relies would be controlling, for they involved subsequent legislative history explicitly declarative of Congress's own intent in passing a given statute, rather than a mere assumption concerning a judicial construction that had been or might be placed on a statute after its enactment.
 
 
 70
 Notwithstanding plaintiff's strained efforts to rewrite the legislative history of Title IX, we find nothing in the legislative history of the Attorney's Fees Award Act that gives us cause to reconsider our holding that no private right of action exists under Title IX. As defendants argue, the legislative history indicates that Congress included Title IX within the Act only to provide for the possibility that the statute might be construed in the future as authorizing judicial implication of a private right of action. This seems clear from a colloquy among Representatives Quie, Anderson, Drinan, Bauman and Railsback, in which Representatives Quie and Bauman expressed concern that the Attorney's Fee Award Act might be construed as impliedly authorizing private individuals to bring suit under Title IX. 122 Cong. Rec. H. 12152-53 (daily ed. Oct. 1, 1976). Representatives Anderson, Drinan and Railsback, all supporters of the bill, denied that it would effect any change in pre-existing law concerning an individual's right to sue under Title IX. Representative Railsback made their position clear:
 
 
 71
 "I would simply like to point out that, as I understand it, it is clearly not the intent of Congress to create a new remedy, but that, rather, this bill would create a remedy only in the event that the courts should in the future determine that an individual may sue under the statutes.
 
 
 72
 And the bill does not authorize or statutorily grant any private right of action which does not now exist. At least I feel certain that is our intent. I think we ought to establish that in the Record." 122 Cong. Rec. H. 12152 (daily ed. Oct. 1, 1976).
 
 
 73
 Representative Drinan, the House sponsor of the Senate bill under consideration, "concur(red) completely" in Representative Railsback's comments: "We do not create any new statutory right of action in the bill today." 122 Cong. Rec. H. 12153 (daily ed. Oct. 1, 1976). Any ambiguity inherent in the above record was dispelled by Representative Railsback's subsequent remarks that went unchallenged during final debate on passage of the bill:
 
 
 74
 "Mr. RAILSBACK. Mr. Speaker, I rise in support of S. 2278 which is designed to allow the court, in its discretion, to award reasonable attorney fees to prevailing parties other than the United States in suits to enforce the Civil Rights Acts which Congress has enacted since 1866.
 
 
 75
 Mr. Speaker, In considering S. 2278 for passage today, I have been alerted to several legal issues which were not raised at hearings held by the Senate and House committees. Not wishing to establish any legal precedents by implication, I would like to make several points explicitly clear with respect to the intent of this bill.
 
 
 76
 I have been informed by the Committee on Education and Labor as well as several education associations that under title VI of the Civil Rights Act and title IX of the Education Amendments of 1972 there exists a serious question as to whether an individual complainant or class of complainants has the right to sue as a private plaintiff. To date the Department of Health, Education and Welfare has been the prime enforcer of these titles and in the case of Cannon against University of Chicago, the Seventh Circuit U.S. Court of Appeals stated that Congress gave the right of action to HEW and not to private individuals.
 
 
 77
 It has been brought to my attention that by granting attorneys' fees to prevailing parties other than the United States, Congress might implicitly authorize a private right of action under title VI and title IX. This is not the intent of Congress. This bill merely creates a remedy in the event the courts determine that an individual may sue under these statutes. This bill does not authorize or statutorily grant any private right of action which does not now exist." 122 Cong. Rec. H. 12161 (daily ed. Oct. 1, 1976).
 
 
 78
 We doubt that the legislative history could be much clearer. Congress certainly was not engaged in any effort to rewrite the legislative history of Title IX or to declare its pre-existing intent to create a private right of action thereunder when it included Title IX within the provisions of the Attorney's Fees Award Act. As is clear from Representative Railsback's reference to our holding in the case at bar, Congress did not intend to imply any opinion on the merits of the question before us here. The Act's inclusion of Title IX was intended merely to provide for the possibility that some court might deem it appropriate in the future to imply a private right of action from the provisions of Title IX. It was not intended to do more.
 
 II.
 
 79
 Although our principal motivation in granting rehearing was to obtain the parties' views on the potential impact of the Attorney's Fees Award Act of 1976 on our resolution of the Title IX issue, we were also curious as to why the Department of Health, Education and Welfare, which had consistently supported its codefendants' position that no private cause of action lies under Title IX, did an about face on the merits of that issue in its answer to plaintiff's petition for rehearing. Unfortunately, neither the Department's answer nor its subsequent brief on rehearing explains why the Department no longer believes that "Title IX's administrative procedural remedies were meant to suffice in enforcing Title IX's prohibitions against sex discrimination." Supplemental Brief of the Department of Health, Education and Welfare, Office of Civil Rights at 8. Whatever the reason for the Department's change of heart, it has now adopted the position that implication of a private cause of action under Title IX is justified under the criteria set out in Cort v. Ash, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975):
 
 
 80
 "In determining whether a private remedy is implicit in a statute not expressly providing one, several factors are relevant. First, is the plaintiff 'one of the class for whose especial benefit the statute was enacted,' that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? And finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law?" Id. at 78, 95 S.Ct. at 2088 (emphasis in original) (citations omitted.)
 
 
 81
 In view of the plaintiff's new arguments regarding Congress's implicit legislative intent in enacting Title IX and the Department's lengthy arguments from Cort, we will briefly restate our reasoning in terms thereof.
 
 
 82
 Assuming arguendo that plaintiff is a member of the class for whose benefit Title IX was enacted, and that a Title IX action would not displace remedies traditionally available at state law, we remain of the view that implication of a private judicial remedy would be inconsistent with the legislative intent and underlying purposes of the statutory scheme.
 
 
 83
 We are unpersuaded by the Department's argument that implication of a private right of action must be deemed consistent with the legislative purposes of Title IX simply because private party suits would provide a useful means of enforcing the statutory policy of prohibiting discrimination on the basis of sex in federally funded educational programs. Such an argument goes too far, for implication of a private right to enforce every federal statute would have the same effect of assisting agency efforts to obtain compliance with federal policies. Simply put, the argument begs the question of whether implication of a private judicial remedy is consistent with the purposes of a legislative scheme that gives responsibility for enforcing its statutory policies to an administrative agency rather than to "private attorneys general." We think it clear from the face of the statute and the regulations promulgated pursuant thereto that, in providing private parties with an administrative but not a judicial forum in which to raise complaints of sex discrimination,[4] it was Congress's purpose to commit the screening of Title IX complaints to the administrative agencies charged with the responsibility of overseeing federally funded educational programs and to encourage resolution of those complaints by means of agency conciliation efforts directed at achieving voluntary compliance with the statutory prohibition. Those purposes would not be served by implying a statutory cause of action that would permit private parties to circumvent the remedial scheme created by Congress. See, e.g., Johnson v. Railway Express Agency, 421 U.S. 454, 461, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975).
 
 
 84
 Nor are we convinced that there is anything in the legislative history of Title IX indicative of an explicit or implicit intent to create or allow a private right of action. We are told that because federal court decisions implying a private right of action under Title VI of the Civil Rights Act of 1964 existed at the time Title IX was adopted,[5] we may infer that Congress intended that a private judicial remedy be made available under Title IX in view of Congress's explicit intent to pattern the remedial provisions of Title IX after those of Title VI. First of all, we do not read those decisions as affirmatively establishing the existence of an implied private right of action under Title VI at the time Title IX was enacted.[6] More important, there is nothing in the legislative history of Title IX itself indicating that Congress was even aware of those decisions, let alone intended to adopt their construction of Title VI.
 
 
 85
 Given the lack of any explicit or implicit intent to create a private judicial remedy in the legislative history of Title IX itself, we remain of the view that Congress's express provision of a sophisticated scheme of administrative enforcement should be construed as an indication of an implicit legislative intent to exclude any private judicial remedies for violations of Title IX other than the judicial review mechanism Congress made available to private parties in the statute. See National Railroad Passenger Corp. v. National Ass'n of Railroad Passengers, 414 U.S. 453, 458-61, 94 S.Ct. 690, 38 L.Ed.2d 646 (1974); Goldman v. First Federal Savings and Loan Ass'n, 518 F.2d 1247, 1250 n. 6 (7th Cir. 1975).
 
 
 86
 We recognize, of course, that Cort v. Ash, supra at 82, states that it is not necessary for the legislative history of a statute to show an explicit intent to create a private right of action for us to imply one for violations of a federally created right. It does not follow, however, that we must imply a private right of action simply because the legislative history shows no explicit intent to deny one. Were we confronted with an alleged violation of a fundamental federal constitutional or statutory right for which Congress has provided no remedy at all, or for which the remedies available have proven to be wholly inadequate to the task of protecting those rights, we might take a different view of the matter. E.g., Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics, 403 U.S. 388, 390-97, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971); Steele v. Louisville & Nashville R.R., 323 U.S. 192, 206-07, 65 S.Ct. 226, 89 L.Ed. 173 (1944); Lloyd v. Regional Transportation Authority, 548 F.2d 1277, 1285-87 (7th Cir. 1977). Under the circumstances of this case, however, we believe it would be an unwarranted exercise of federal judicial power to imply a private right of action in the face of a sophisticated scheme of administrative enforcement and judicial review that, if given an opportunity to work, may well prove itself adequate to the task for which Congress designed it. Simply put, notwithstanding the Department's change of heart, we remain unpersuaded that it is a "necessity" to imply a private right of action under Title IX to effectuate the purposes of Congress's legislative scheme. Piper v. Chris-Craft Indus., Inc., 430, 1, 24-26 97 S.Ct. 926, 941, 51 L.Ed.2d 124 (1977).III.
 
 
 87
 We have on rehearing also reconsidered plaintiff's argument that Lau v. Nichols, 414 U.S. 563, 94 S.Ct. 786, 39 L.Ed.2d 1 (1974), controls the case before us.
 
 
 88
 Previously we distinguished Lau on the ground that it involved a class suit against a public school system rather than an individual suit against the private universities before us here. In so doing, we relied heavily on the Tenth Circuit's reading of Mr. Justice Blackmun's concurring opinion in Lau, which prompted that court to conclude that "only when a substantial group is being deprived of a meaningful education will a Title VI violation exist." Serna v. Portales Municipal Schools, 499 F.2d 1147, 1154 (10th Cir. 1974); accord, Otero v. Mesa County Valley School Dist. No. 51, 408 F.Supp. 162, 170-72 (D. Colo. 1975); see Pabon v. Levine, 70 F.R.D. 674, 676-77 (S.D.N.Y. 1976) (Weinfeld, J.).
 
 
 89
 On rehearing, both the Department and the plaintiff argue that we misconstrued the import of Justice Blackmun's concurring opinion in Lau, which states:
 
 
 90
 "(If) we . . . (were) concerned . . . with just a single child, . . . I would not regard today's decision . . . as conclusive upon the issue of whether the statute and the guidelines required the funded school district to provide special instruction." 414 U.S. at 571-72, 94 S.Ct. at 791.
 
 
 91
 Justice Blackmun's caveat, we are told, was directed only to the appropriateness of the type of relief ordered in that case rather than to the question of whether a Title VI violation would have been made out if only a single plaintiff was involved.
 
 
 92
 We are not convinced that our reliance on Serna's reading of Lau was misplaced, but, even if we were, we would still adhere to our statement that Lau provides no real support for plaintiff in the circumstances of this case. Our conclusion would remain the same because Lau was brought under the authority of 42 U.S.C. § 1983, and the question of whether an implied private right of action lay directly under the provisions of Title VI was never presented to the Supreme Court.[7] Because plaintiffs' cause of action in Lau arose under 42 U.S.C. § 1983, Lau simply cannot be read as supporting the proposition that private parties have an implied cause of action under Title VI that would mandate implication of a private right of action here under the comparable provisions of Title IX. Accordingly, neither Lau nor any other decision relying thereon for the proposition that an implied private right of action lies directly under Title VI is of help to the plaintiff at bar, who is unable to invoke 42 U.S.C. § 1983 because she is suing private universities acting under color of no state law.
 
 
 93
 We adhere to our previous holding that no private right of action lies under Title IX in the circumstances of this case.
 
 
 
 *
 The Hon. Robert A. Grant, United States District Court for the Northern District of Indiana, is sitting by designation
 
 
 [1]
 Although the factual analysis and statistics quoted relate only to the University of Chicago Medical School, the admission practices are similar at Northwestern. The plaintiff also brought an administrative complaint against all the other medical schools in the State of Illinois. Each of them also refused her admission
 
 
 [2]
 The factual picture presented by comparing the plaintiff's qualifications against the objective standard set by the statistical record of the entering class indicates that it would have been unfair to admit plaintiff to the class ahead of at least the 2,000 other applicants who had better academic records. Of course we realize that admission committees base their decisions upon other factors in addition to the applicant's academic record, such as past achievement in employment or extracurricular activities. There is no allegation that plaintiff's past employment or extracurricular activity brought extra attention to her application
 
 
 [3]
 Plaintiff filed an administrative sex discrimination complaint with HEW upon receiving notice of her rejection for admission to the medical school at the University of Chicago. Later she also filed complaints against Northwestern, Southern Illinois University Medical School, Stritch School of Medicine at Loyola University, and the University of Illinois Medical School. When informed that the investigation of her complaints would be delayed, plaintiff named the regional director and HEW as party defendants in this suit. Presently HEW is still investigating her claim of discrimination
 
 
 [4]
 42 U.S.C. § 1983 states:
 "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other persons within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities, secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proceeding for redress."
 
 
 [5]
 Plaintiff seeks to distinguish Moose Lodge No. 107 v. Irvis, supra, on the basis that no financial assistance was involved in that case. We note that the use of a liquor license to a private club can be just as important as financial assistance to a private university
 
 
 [6]
 See, Washington v. Davis, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976)
 
 
 [7]
 Plaintiff does make the allegation that both defendants accept a greater proportion of Illinois residents in the entering class than residents from any other State. She claims this fact demonstrates the influence and control the State has over the admission policies of the schools. We believe that plaintiff's conclusion is not justified. The fact that both schools have a higher number of in-state residents may be directly related to the fact that more Illinois residents accept positions in the schools because they are conveniently located to their homes. In addition, more Illinois residents probably apply for admission than residents of any other State. Even assuming that the admission policy favored Illinois residents, we see no state action unless the schools' decisions are directly related to some state control. And, even if the State did require that Illinois residents be favored, such a requirement is generally permissible under the Fourteenth Amendment. It is reasonable and rational that a state institution favor its own taxpayers, or the children of its taxpayers, in selecting an entering class. In any event, plaintiff has no standing to formally raise this claim since, assuming arguendo the defendants favor Illinois residents, she stands to benefit from such a policy
 
 
 [8]
 Plaintiff has also sought to show that the federal financial assistance given to the defendants impliedly grants jurisdiction to the federal courts to consider allegations of discriminatory federal action. To support this Fifth Amendment claim, she cites Green v. Kennedy, 309 F.Supp. 1127 (D.C.D.C. 1970), appeal dismissed sub nom. Cannon v. Green, 398 U.S. 956, 90 S.Ct. 2169, 26 L.Ed.2d 539 (1970); Green v. Connally, 330 F.Supp. 1150 (D.C.D.C. 1971), aff'd sub nom. Cait v. Green, 404 U.S. 997, 92 S.Ct. 564, 30 L.Ed.2d 550 (1971). But those suits were brought against a federal officer to enjoin direct government conduct which conferred tax exempt status upon racially segregated schools. The factual setting of those decisions were far different than the instant case. In this case, which is primarily a § 1983 suit (the HEW regional director joined as a defendant only because of alleged administrative misfeasance), the fact that there is federal support cannot be used to create § 1983 jurisdiction. Weise v. Syracuse University, 522 F.2d 397, 404 (2d Cir. 1975); Greco v. Orange Memorial Hospital, 513 F.2d 873, 876, n. 3 (5th Cir. 1975); Blackburn v. Fisk University, 443 F.2d 121, 123 (6th Cir. 1971); Browns v. Mitchell, 409 F.2d 593, 595 (10th Cir. 1969); see Bivens v. Six Unknown Named Agents, 456 F.2d 1339, 1346 (2d Cir. 1972). Furthermore, it should be noted that jurisdiction based on federal action has been interpreted analogously to that of state action. Thus plaintiff must show the same amount of significant involvement of the federal government in the discriminatory conduct that is being alleged. Junior Chamber of Commerce v. United States Jaycees, 495 F.2d 883 (10th Cir. 1974)
 
 
 [9]
 Plaintiff claims that at least three actions have been maintained by private plaintiffs under Title IX, i.e., Brenden v. Independent School Dist. 742, 477 F.2d 1292 (8th Cir. 1973); Berkelman v. San Francisco Unified School Dist., 501 F.2d 1264 (9th Cir. 1974); and Trent v. Perritt, 391 F.Supp. 171 (D.C.Mass. 1975). Plaintiff's reliance upon these decisions is clearly misplaced. Title IX, while mentioned in the decisions, was not relied upon as establishing jurisdiction. Those cases involved sex discrimination which amounted to a violation of the equal protection clause, and there was no serious jurisdictional problem
 
 
 [10]
 Title VI, 42 U.S.C. § 2000d states, inter alia:
 "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."
 
 
 [11]
 The courts have frequently allowed private rights of action under statutes which did not specifically provide for such an action. Usually, in this situation, the court is called upon to utilize its power of statutory construction in conjunction with certain policy reasons for allowing a new independent cause of action. See J. I. Case Co. v. Borak, 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964); Rosado v. Wyman, 397 U.S. 397, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970); Allen v. Board of Elections, 393 U.S. 544, 89 S.Ct. 817, 22 L.Ed.2d 1 (1969); Wyandotte Transp. Co. v. United States, 389 U.S. 191, 88 S.Ct. 379, 19 L.Ed.2d 407 (1967). This concept has become known as the "doctrine of implication":
 "Some commentators find two separate theories in the doctrine of implication. One author speaks of the 'pre-existing duty' and 'statutory tort' theories. The pre-existing duty theory assumes that the statute is not creating a new cause of action, but is merely defining the standard of conduct required within the context of a duty already owed to the plaintiff. This analysis is most frequently used in tort cases where plaintiff's claim rests upon negligence codified by statutes such as the Federal railroad safety standards. The statutory tort theory . . . is derived from section 286 of the Restatement of Torts and allows creation of a new cause of action based on the statutory declaration that certain behavior, although perhaps previously legal, is now wrongful." "Implying Civil Remedies from Federal Regulatory Statutes," 77 Harv.L.Rev. 285, 286 (1963).
 
 
 [12]
 20 U.S.C. § 1682 states, inter alia:
 "Each Federal department and agency which is empowered to extend Federal financial assistance to any education program or activity, . . . is authorized and directed to effectuate the provisions of section 1681 of this title with respect to such program or activity by issuing rules, regulations, or orders . . . . Compliance . . . may be effected (1) by the termination of or refusal to grant or to continue assistance under such program or activity to any recipient as to whom there has been an express finding on the record, after opportunity for hearing, of a failure to comply with such requirement . . . . Provided, however, That no such action shall be taken until the department or agency concerned has advised the appropriate person or persons of the failure to comply with the requirement and has determined that compliance cannot be secured by voluntary means. . . . "
 
 
 [13]
 20 U.S.C. § 1683 states:
 "Any department or agency action taken pursuant to section 1682 of this title shall be subject to such judicial review as may otherwise be provided by law for similar action taken by such department or agency on other grounds. In the case of action, not otherwise subject to judicial review, terminating or refusing to grant or to continue financial assistance upon a finding of failure to comply with any requirement imposed pursuant to section 1682 of this title, any person aggrieved (including any State or political subdivision thereof and any agency of either) may obtain judicial review of such action in accordance with chapter 7 of Title 5, and such action shall not be deemed committed to unreviewable agency discretion within the meaning of section 701 of that title."
 
 
 [14]
 In Goldman v. First Federal Savings and Loan, 518 F.2d 1247, 1250 n. 6 (7th Cir. 1975), this Court commented, but did not decide, that a private cause of action may not be permissible where Congress had provided for other means of enforcement
 
 
 [15]
 See 1972 U.S.Code Cong. and Admin. News at 2590 for the additional views of Congressmen Quie and Erlenborn that perhaps sexual discrimination could best be ended without the intrusion of a maze of government regulations. These comments are additionally persuasive since, if the Congressmen believed that Title IX provided for an independent cause of action in addition to the administrative regulations, they surely would have commented when stating in writing their various objections to Title IX
 
 
 [16]
 We note, but do not decide, that a suit brought by a large group to enforce the national interest against sexual discrimination may be possible under Title IX. Certainly it was permitted by the Supreme Court under Title VI in Lau v. Nichols, supra
 
 
 [17]
 Another objection to the implication of a private remedy arises where Congress has delegated authority to an administrative agency to enforce the statute. Under the doctrine of primary jurisdiction a court has no jurisdiction to accept a case until the issues, requiring resolution of questions within the agency's area of expertise, have been reviewed by the agency with the special competence to deal with the problem. In this case we believe that the HEW is in a much better position to evaluate the statistics of the applicant and entering classes at the various medical schools. In addition, HEW has the benefit of comparing the local practice to the admission policies on a national level
 
 
 [18]
 See Shelton & Berndt, "Sex Discrimination in Vocational Education: Title IX and Other Remedies," 62 Calif.L.Rev. 1121, 1153-54 (1974); Comment, 53 Tex.L.Rev. 103, 120 (1974). As one commentator has noted:
 "A review of HEW's prior enforcement efforts utilizing procedures identical or similar to the rules under which Title IX will be enforced reveals glaring defects. The use of administrative proceedings as a method of enforcing regulations under HEW's authority can best be characterized by delay caused by protracted negotiations and failure to initiate enforcement proceedings within a reasonable time after noncompliance is found. Even where a voluntary compliance program is negotiated, HEW's failure to periodically follow up on implementation has resulted in the same areas of noncompliance being cited in subsequent reviews." Comment, 49 Temple L.Rev. 207, 221-22 (1975).
 We only hasten to add that allowing individual litigation, under Title IX is no solution. Individual suits invariably lead to delay, compromise, and inconsistent results. In the area of racial discrimination HEW efforts were similarly slow and ineffective in the early sixties. However, in the late sixties HEW vigorously utilized its enforcement procedures in integrating Southern schools. Perhaps the same battle will eventually be waged against sex discrimination through the use of Title IX.
 
 
 [19]
 Plaintiff has also argued that the federal courts have jurisdiction under Title IX to review a sex discrimination claim when HEW has failed to take sufficient action on the administrative complaint. We need not decide that question in this case since the record indicates that HEW is actively investigating plaintiff's charges of sex discrimination by the medical schools. In this instance it would be improvident for us to find jurisdiction under Title IX as urged by plaintiff on the basis of naming HEW as a defendant and alleging agency inaction
 
 
 [20]
 The statute provides, inter alia:
 "It shall be unlawful for an employment agency to fail or refuse to refer for employment, or otherwise to discriminate against, any individual because of such individual's age, or to classify or refer for employment any individual on the basis of such individual's age." 29 U.S.C. § 623(b).
 
 
 [21]
 The complaint alleges that the Information Booklet for all United States medical schools published by the Association of American Medical Colleges includes in a summary description of the admissions criteria for the Pritzker School of Medicine the statement that: "Applicants over 30 without advance degrees . . . are not encouraged to apply." Of course, for the purpose of this appeal, we assume that the allegation is true
 
 
 [22]
 29 U.S.C. § 630(c) states, inter alia:
 "The term 'employment agency' means any person regularly undertaking with or without compensation to procure employees for an employer and includes an agent of such person, but shall not include an agency of the United States."
 
 
 [23]
 42 U.S.C. § 2000e(c) states, inter alia:
 "Any person regularly undertaking with or without compensation to procure employees for an employer or to procure for employees opportunities to work for an employer and includes agents of such a person."
 
 
 [24]
 The Court in Kaplowitz, supra, did not need to make an express finding that the law school acted as an employment agency in order to decide the case. Thus the language relied upon by plaintiff is dicta
 
 
 [25]
 29 U.S.C. § 626(d) states, inter alia:
 "No civil action may be commenced by any individual under this section until the individual has given the Secretary not less than sixty days' notice of an intent to file such action. Such notice shall be filed
 (1) within one hundred and eighty days after the alleged unlawful practice occurred. . . .
 Upon receiving a notice of intent to sue, the Secretary shall promptly notify all persons named therein as prospective defendants in the action and shall promptly seek to eliminate any alleged unlawful practice by informal means of conciliation, conference, and persuasion."
 
 
 [26]
 Section 799A of the Public Health Services Act, 42 U.S.C. § 295h-9 states, inter alia:
 "The Secretary may not make a grant . . . for the benefit of, any school of medicine . . . unless the application for the grant . . . . contains assurances satisfactory to the Secretary that the school or training center will not discriminate on the basis of sex in the admission of individuals to its training programs. . . . "
 
 
 [27]
 See Euresti v. Stenner, 458 F.2d 1115 (10th Cir. 1072); Organized Migrants in Community Action, Inc. v. James Arthur Smith Hospital, 325 F.Supp. 268 (S.D.Fla. 1971); Cook v. Ochsner Foundation Hospital, 319 F.Supp. 603 (E.D.La. 1970); Porrier v. St. James Parish Police Jury, 372 F.Supp. 1021 (E.D.La. 1974)
 
 
 [1]
 We denied plaintiff's petition for rehearing of the other issues raised and decided in our opinion, and the Court internally stayed action on plaintiff's suggestion for rehearing en banc of the entire case pending our decision on rehearing
 
 
 [2]
 122 Cong. Rec. S. 17052 (daily ed. Sept. 29, 1976) (remarks of Sen. Abourezk); 122 Cong. Rec. S. 17051 (daily ed. Sept. 29, 1976) (remarks of Sen. Tunney); 122 Cong. Rec. S. 16431 (daily ed. Sept. 22, 1976) (remarks of Sen. Hathaway); 122 Cong. Rec. S. 16262 (daily ed. Sept. 22, 1976) (remarks of Sen. Allen); 122 Cong. Rec. S. 16252 (daily ed. Sept. 21, 1976) (remarks of Sen. Scott); 122 Cong. Rec. H. 12165 (daily ed. Oct. 1, 1976) (remarks of Rep. Sieberling); 122 Cong. Rec. H. 12159 (daily ed. Oct. 1, 1976) (remarks of Rep. Drinan)
 
 
 [3]
 Glidden Co. v. Zdanok, 370 U.S. 530, 541-42, 82 S.Ct. 1459, 8 L.Ed.2d 671 (1961); Federal Housing Administration v. The Darlington, Inc., 358 U.S. 84, 90, 79 S.Ct. 141, 3 L.Ed.2d 132 (1958); Sioux Tribe v. United States, 316 U.S. 317, 329-30, 62 S.Ct. 1095, 86 L.Ed. 1501 (1942); New York, Philadelphia & Norfolk R. R. v. Peninsula Produce Exchange, 240 U.S. 34, 39, 36 S.Ct. 230, 60 L.Ed. 511 (1915); Cope v. Cope, 137 U.S. 682, 688, 11 S.Ct. 222, 34 L.Ed. 823 (1891)
 
 
 [4]
 Section 901(a) of Title IX prohibits discrimination on the basis of sex in federally funded educational programs. 20 U.S.C. § 1681(a). Section 902 provides for administrative enforcement of the statutory prohibition by directing each federal agency providing financial assistance "to effectuate the provisions of section 1681 . . . by issuing rules, regulations, or orders of general applicability which shall be consistent with achievement of the objectives of the statute . . . ." 20 U.S.C. § 1682. Pursuant to the directive given above, the Department of Health, Education and Welfare has established interim regulations permitting private parties to file complaints of sex discrimination and providing for a prompt and thorough investigation of any such complaints. 45 C.F.R. § 86.71, adopting by reference 45 C.F.R. § 80.7(b). The Department's regulations provide that compliance shall be secured by informal means, if possible, and otherwise by "any other means authorized by law." 45 C.F.R. § 86.71, adopting by reference, 45 C.F.R. § 80.8(a). However,
 "(d) No action to effect compliance by any other means authorized by law shall be taken until (1) the responsible Department official has determined that compliance cannot be secured by voluntary means, (2) the recipient or other person has been notified of its failure to comply and of the action to be taken to effect compliance, and (3) the expiration of at least 10 days from the mailing of such notice to the recipient or other person. During this period of at least 10 days, additional efforts shall be made to persuade the recipient or other person to comply with the regulation and to take such corrective action as may be appropriate." 45 C.F.R. § 86.71, adopting by reference 45 C.F.R. § 80.8(d).
 
 
 [5]
 Plaintiff calls to our attention a number of such cases. Alvarado v. El Paso Indep. School Dist., 445 F.2d 1011 (5th Cir. 1971); Kelley v. Altheimer Public School Dist., 378 F.2d 483 (8th Cir. 1967); Cypress v. Newport News General and Nonsectarian Hospital Ass'n, 375 F.2d 648 (4th Cir. 1967); Bossier Parish School Bd. v. Lemon, 370 F.2d 847 (5th Cir.), cert. denied, 388 U.S. 911, 87 S.Ct. 2116, 18 L.Ed.2d 1350 (1967)
 The Department of Health, Education and Welfare also refers us to a number of district court cases and the Sixth Circuit's decision in Nashville I-40 Steering Comm. v. Ellington, 387 F.2d 179 (6th Cir. 1967), cert. denied, 390 U.S. 921, 88 S.Ct. 857, 19 L.Ed.2d 982 (1968).
 
 
 [6]
 Most of the cases cited in note 5 supra were in fact explicitly brought under the authority of 42 U.S.C. § 1983 to redress violations of rights granted by Title VI, and not under the implied auspices of Title VI itself. In view of the fact that the cases were brought under Section 1983, statements made therein that private parties had stated a claim under Title VI must be read as simply a shorthand way of saying that a cause of action under Section 1983 had been made out by virtue of the sufficiency of the allegations that Title VI had been violated
 We suspect that even the cases that do not expressly mention Section 1983 were in fact brought under that statute, for all the cases cited to us appear to have been brought against public agencies acting under color of state law. Although the Fifth Circuit's broad dictum in Bossier lends some support to plaintiff's assertion that it recognized an implied right of action under Title VI, we note that the suit was brought to desegregate a public school system, and the court's actual holding was merely that "these plaintiffs have standing to assert their right to equal educational opportunities with white children." 370 F.2d at 852 (emphasis added). As we read the case, Bossier relies on Title VI's prohibition of racial discrimination in federally funded educational programs merely to give plaintiffs the requisite standing to sue "to enforce a national constitutional right." Id. at 851 (emphasis added). As the suit was brought to enforce "the constitutional right of Negro school children to equal educational opportunities with white children," id. at 849, we doubt that the court meant to hold that private parties have an implied cause of action under Title VI alone. Moreover, it seems logical to assume that the suit was brought under the authority of Section 1983, for, as far as we know, no precedent existed at the time Bossier was decided for the proposition that anyone could bring a suit directly under the Fourteenth Amendment to enforce rights guaranteed by the equal protection clause without some independent statutory authorization such as Section 1983.
 
 
 [7]
 The jurisdictional statement in the Lau plaintiffs' complaint shows that their constitutional and statutory claims were brought under 42 U.S.C. § 1983:
 "Jurisdiction is conferred upon this Court by 28 U.S.C. § 1331 and by 28 U.S.C. § 1343(3)(4), which provide original jurisdiction in suits authorized by 42 U.S.C. § 1983." Plaintiffs' Complaint for Injunctive and Declaratory Relief, Lau v. Nichols, 414 U.S. 563, 94 S.Ct. 786, 39 L.Ed.2d 1 (1974) (emphasis added).
 A review of the briefs filed in the Supreme Court reveals that the parties presented no jurisdictional issues to the Court, and at least one of the amici briefs filed in support of plaintiffs' claims makes explicit that
 "petitioners sought in this action, brought under 42 U.S.C. § 1983, to require respondents to provide them assistance in learning English so that they might benefit from school as other children do. They contended that respondents' failure to provide such assistance violates the Equal Protection Clause of the Fourteenth Amendment and Title VI of the Civil Rights Act of 1964 and regulations thereunder." Brief for the National Education Association and the California Teachers Association as Amici Curiae at 5, Lau v. Nichols, 414 U.S. 563, 94 S.Ct. 786, 39 L.Ed.2d 1 (1974) (emphasis added).