**LOCAL DIVISION 519, AMALGAMATED TRANSIT UNION, AFL–CIO, Plaintiff,**

v.

**The LaCROSSE MUNICIPAL TRANSIT UTILITY and the City of LaCrosse, Wisconsin, Defendants.**

No. 77–C–292.

United States District Court, W. D. Wisconsin.

Jan. 27, 1978.

As Amended March 8, 1978.

Linda R. Hirshman, of Jacobs, Burns, Sugarman & Orlove, Chicago, Ill., for plaintiff.

Joseph S. Kaufman, D. Christopher Ohly, and Everett Hale of Melnicove, Kaufman & Wiener, P.A., Baltimore, Md., for defendants.

## OPINION AND ORDER

JAMES E. DOYLE, District Judge.

This opinion and order are directed to a motion to dismiss for lack of subject matter jurisdiction.

On August 3, 1977, the plaintiff ("Local 519") filed a verified complaint alleging jurisdiction under 28 U.S.C. § 1331 and 49 U.S.C. § 1601 et seq., and a motion for a preliminary injunction ordering defendants (collectively referred to herein as "La-Crosse") to enter into arbitration of the terms of a new collective bargaining agreement. On August 23, 1977, defendants filed an answer to the complaint which, among other things, denied that jurisdiction is present.

On August 25, 1977, after submission of affidavits and briefs, this court held a hearing on Local 519's motion. Neither the question of federal subject matter jurisdiction nor that of the propriety of abstention was raised by defendants in opposition to the motion for a preliminary injunction. On August 31, I granted a preliminary injunction compelling LaCrosse to proceed to arbitration. On September 9, an appeal from that order was filed. On September 26, LaCrosse filed a motion in this court for a stay pending appeal. On September 30, Local 519 filed a motion for the issuance of an order to show cause and for a judgment of contempt against LaCrosse for failure to comply with the preliminary injunction.

It was not until October 12 that LaCrosse filed the motion to which this opinion and order are directed. The motion seeks an order dismissing the complaint for lack of subject matter jurisdiction. Alternatively, it seeks a determination that this court should abstain from exercising its jurisdiction. The motion purports to have been filed pursuant to Rules 12(b)(6) and 12(h) of the Federal Rules of Civil Procedure. On October 25, a hearing was held. At the conclusion of the hearing, I made the following rulings from the bench: construing the motion to dismiss as a double motion (1) to vacate the preliminary injunction on the ground that this court lacked jurisdiction to enter it and (2) to dismiss the complaint for lack of jurisdiction, I denied the motion to vacate the preliminary injunction and, because an appeal from the preliminary injunction had already been taken, I reserved a ruling on the motion to dismiss; I granted LaCrosse a 30-day stay of the preliminary injunction entered on August 31; and I denied Local 519's motion for an order to show cause why LaCrosse should not be held in contempt.

Meantime, in the court of appeals La-Crosse had moved for dismissal on jurisdictional grounds or, in the alternative, for remand to this district court for determination of the jurisdictional question, with the appeal from the preliminary injunction to be held in abeyance pending this court's ruling on the jurisdictional question. On October 27 the court of appeals denied these alternative motions by LaCrosse. Because certain motions were being presented to and acted upon by both the district court and court of appeals without sufficient time for one court surely to be aware of all proceedings in the other, uncertainty arose whether further action by this court was appropriate while the appeal from the preliminary injunction remained pending. By direction from the court of appeals dated November 16, 1977, it became clear that I was to proceed, as I do today, to decide LaCrosse's motion, filed October 12, for an order dismissing this action for lack of jurisdiction.

However, a degree of uncertainty persists in two respects. The first is whether I am to proceed presently to decide LaCrosse's alternative motion that I abstain from exercising jurisdiction, if jurisdiction is present; I do decide it below. The second source of uncertainty persists because in support of its assertion that the matter in controversy does not arise under the laws of the United States, within the meaning of 28 U.S.C. § 1331(a), LaCrosse relies entirely upon a contention which I consider to be non-jurisdictional in nature, namely, the contention that the statute in question neither expressly nor impliedly grants Local 519 the remedy sought here. Because able counsel for LaCrosse advance the contention with such confidence that it is jurisdictional in nature, and because able counsel for Local 519, while insisting that Congress implied the remedy, do not appear to deny that La-Crosse's contention is jurisdictional in nature, and because, whether jurisdictional in nature or not, the contention bears importantly upon whether the preliminary injunction was providently granted, I express my opinion on the contention hereinafter.

▇▇ Whether "the matter in controversy . . . arises under the . . . laws . . . of the United States," within the meaning of § 1331(a), is to be determined by looking solely to the allegations of the complaint. *Gully v. First Nat. Bank,* 299 U.S. 109, 113, 57 S.Ct. 96, 81 L.Ed. 70 (1936). See *Pan Am. Corp. v. Superior Court,* 366 U.S. 656, 663, 81 S.Ct. 1303, 6 L.Ed.2d 584 (1961); *Skelly Oil Co. v. Phillips Co.,* 339 U.S. 667, 672, 70 S.Ct. 876, 94 L.Ed. 1194 (1950). It is also to the complaint alone that one must look to determine whether the amount in controversy is sufficient, and, it appears, to determine whether abstention is appropriate and whether Congress has granted to Local 519 by implication the remedy sought. Therefore, the complaint as summarized below, taken as true, provides the sole factual basis for this opinion and order.

## THE COMPLAINT

From about 1900 until 1974–1975, transit service in LaCrosse, Wisconsin, was provided by a private company. Approximately from the beginning of this period until its end, the employees of the private company were represented by plaintiff union, and they enjoyed the protection of collective bargaining agreements. From March 1973 to June 1975, these employees were parties to a specific collective bargaining agreement with the private company, which agreement covered wages, cost of living adjustments, vacation pay, sick leave allowance, health insurance, job security, seniority rights, and pension plan, and included the following provisions:

"SECTION 1—Method of Negotiation

"* * *

"The Company agrees to meet with duly accredited officers and committees of the Union upon all matters relative to wages, hours and working conditions, dealing first through the Superintendent or Operations Manager; then, in case of failure to reach agreement, the matter in dispute shall be taken up with the President of the Company or his accredited representative. In case no agreement is

reached by the representative of the Company and the Union, the matter in dispute shall be submitted, at the request of either party, to a Board of Arbitration selected in the manner hereinafter specified, and the Company and the Union agree that the decision of such Board shall be final and binding on both parties.

"SECTION II—Method of Arbitration

"All differences relating to wages, hours or working conditions of men covered by this agreement which cannot be agreed upon by collective bargaining are to be submitted for decision to an Arbitration Board consisting of Three persons, one chosen by the Company, one chosen by the Union, and the two thus selected shall meet daily and select the third. In case of failure to agree on the third person after Ten days, such party shall be selected through a process of elimination, alternately, between the Company and the Union, from a list submitted by the Wisconsin Labor Relations Board. The Board so constituted shall meet within Three days and the decision rendered by this Board shall be binding upon both parties.

"Either party desiring to arbitrate any case must notify the other party in writing, and the failure of either party to appoint its own Arbitrator within Ten working days after receipt of same shall forfeit its case.

"Each party shall bear the expense of its own Arbitrator, and the expense of the third Arbitrator shall be borne equally by the parties hereto."

In the 1974–1975 acquisition of the private transit company by the City of LaCrosse through the LaCrosse Municipal Transit Utility, the employees of the company became employees of the municipal transit utility. Funds for the conversion of the private bus enterprise into a municipal transit operation were provided, in part, by a federal grant to LaCrosse under the Urban Mass Transportation Act of 1964 (the "UMTA"), as amended. 49 U.S.C. § 1601 et seq. Section 1609(c) of the Code (§ 13(c) of the Act, and hereinafter referred to as § 13(c))[1] requires that as a pre-requisite to federal aid, grant recipients make "fair and equitable arrangements . . . to protect the interests of employees affected by such assistance."

In fulfilment of its obligations under § 13(c) of the Act, LaCrosse entered into an agreement with Local 519 on April 5, 1974, referred to as the "13(c) Agreement," a copy of which is incorporated in the complaint. The 13(c) Agreement recognized Local 519 as the collective bargaining representative of the employees of the Transit Utility, and guaranteed that the Transit Utility would bargain collectively with Local 519 and would arbitrate labor disputes including the making or maintaining of collective bargaining agreements.[2] The

---

1. "(c) It shall be a condition of any assistance under section 1602 of this title that fair and equitable arrangements are made, as determined by the Secretary of Labor, to protect the interests of employees affected by such assistance. Such protective arrangements shall include, without being limited to, such provisions as may be necessary for (1) the preservation of rights, privileges, and benefits (including continuation of pension rights and benefits) under existing collective bargaining agreements or otherwise; (2) the continuation of collective bargaining rights; (3) the protection of individual employees against a worsening of their positions with respect to their employment; (4) assurances of employment to employees of acquired mass transportation systems and priority of reemployment of employees terminated or laid off; and (5) paid training or retraining programs. Such arrangements shall include provisions protecting individual employees against a worsening of their positions with respect to their employment which shall in no event provide benefits less than those established pursuant to section 5(2)(f) of this title. The contract for the granting of any such assistance shall specify the terms and conditions of the protective arrangements."

2. The 13(c) Agreement provides in part:

"(2) All rights, privileges, and benefits (including pension rights and benefits) of employees covered by this agreement (including employees having already retired) under existing collective bargaining agreements or otherwise, or under any revision or renewal thereof, shall be preserved and continued; provided, however, that such rights, privileges and benefits not previously vested may be modified by collective bargaining and agreement by the operator of the transit system and the Union to

13(c) Agreement provided no procedure for enforcing these rights. The 13(c) Agreement was approved by the Secretary of Labor on May 1, 1974, and was explicitly incorporated into the capital grant contract negotiated between the City of LaCrosse and the United States.

On October 10, 1974, LaCrosse and Local 519 entered into a so-called "conversion agreement," providing the wages, terms, and conditions of employment of the employees of the Transit Utility. The conversion agreement took effect on January 1, 1975, the date LaCrosse acquired the assets of the Transit Company and assumed its operation. The conversion agreement did not provide for the arbitration of disputes over the making of subsequent collective bargaining agreements. As of January 1, 1975, the employees of the private company became employees of LaCrosse, and as public employees under Chapter 111, Wisconsin Statutes, were excluded from coverage by the National Labor Relations Act.

In June 1975, the conversion agreement expired. Subsequently, LaCrosse and Local 519 reached an impasse in their negotiations for a new collective bargaining agreement. Local 519 demanded arbitration of the terms to be included in the new collective

bargaining agreement, asserting that such arbitration was required by the 13(c) Agreement. A new contract was established through arbitration by a panel, which stated in its award that the panel had been invoked pursuant to the 13(c) Agreement and that arbitration of the terms of the new collective bargaining agreement was required by § 11 of the 13(c) Agreement. The new contract so established then governed the labor relations between the parties until June 16, 1977, when it expired. LaCrosse and Local 519 again have engaged in collective bargaining over the terms of a new contract but have been at an impasse since June 8, 1977.

On July 8, 1977, Local 519 requested LaCrosse to enter into binding arbitration in accordance with the 13(c) Agreement. On July 14, 1977, LaCrosse refused to enter arbitration.

The Transit Utility employs approximately 45 persons, of whom 32 are members of, and are represented for purposes of collective bargaining by, Local 519. The collective bargaining agreement which expired June 16, 1977, called for hourly wages well in excess of four dollars, and generally for work weeks of forty hours or more.

substitute rights, privileges and benefits of equal or greater economic value.

"(3) The collective bargaining rights of employees represented by the Union, including the right to arbitrate labor disputes and to maintain union security and checkoff arrangements, as provided by applicable laws, policies and/or existing collective bargaining agreements shall be preserved and continued. The Public Body agrees that it will bargain collectively with the Union or otherwise arrange for the continuation of collective bargaining, and that it will enter into agreements with the Union or arrange for such agreements to be entered into, relative to all subjects which are or may be proper subjects of collective bargaining with a private employer.
"* * *

"(11) In the event of any labor dispute involving the Public Body and the employees covered by this agreement which cannot be settled within thirty (30) days after such dispute first arises, such dispute may be submitted at the written request of either the Union or the Public Body to a board of arbitration selected in accordance with the existing collective bargaining agreement, if any, or if none, as

hereinafter provided. . . . The term 'labor dispute' shall be broadly construed and shall include, but not be limited to, any controversy concerning wages, salaries, hours, working conditions or benefits, including health and welfare, sick leave, insurance or pension and retirement provisions, the making or maintaining of collective bargaining agreements, the terms to be included in such agreements and the interpretation and application of such collective bargaining agreements. . . .
"* * *

"(17) If this Project is approved for assistance under the Act, the foregoing terms and conditions shall be made part of the contract of assistance between the Federal Government and the applicant for federal funds, provided, however, that this agreement shall not merge into the contract of assistance, but shall be independently binding and enforceable by and upon the parties hereto, in accordance with its terms; nor shall the collective bargaining agreement between the Union and the operator of the transit system merge into this agreement, but each shall be independently binding and enforceable by and upon the parties thereto, in accordance with its terms."

Local 519 claims that LaCrosse's refusal to proceed to arbitration of the disputed terms of the new collective bargaining agreement is a breach of the requirements of the 13(c) Agreement effectuating § 13(c) of the UMTA. Local 519 further claims that LaCrosse's refusal to proceed to arbitration is a breach of the capital grant contract between the City of LaCrosse, Wisconsin and the United States of America, which incorporates the provisions of the 13(c) Agreement.

## SUBJECT MATTER JURISDICTION—"ARISES UNDER"

■ Despite the fact that it had answered the complaint herein prior to filing its October 12, 1977, motion to dismiss for lack of subject matter jurisdiction, LaCrosse's motion on that ground is timely under Rule 12(h)(3).

*Bell v. Hood,* 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939 (1946), unequivocally decided that the actual validity of the claim asserted is irrelevant to the issue whether the "matter in controversy . . . arises under the . . . laws . . . of the United States," within the meaning of 28 U.S.C. § 1331(a). The petitioners had brought suit to recover damages from agents of the Federal Bureau of Investigation for the alleged violation of their Fourth Amendment right to be free from unreasonable searches and seizures and their Fifth Amendment right to be free from deprivation of liberty without due process of law. The district court dismissed the complaint for want of jurisdiction because neither the Constitution nor the laws of the United States expressly provided for the award of money damages for deprivation of Fourth or Fifth Amendment rights. The Court of Appeals affirmed. 150 F.2d 96 (9th Cir. 1945). The Supreme Court held that a complaint seeking to recover directly under the Constitution or the laws of the United States establishes federal jurisdiction except where the claim is immaterial and made solely for the purpose of obtaining jurisdiction or where the claim is wholly insubstantial and frivolous. 327 U.S., at 682, 66 S.Ct. 773. The Court clearly differentiated between the question whether to assume jurisdiction and the question whether the allegations state a cause of action upon which the Court could grant relief (*id.* at 682, 66 S.Ct. at 776):

"Jurisdiction, therefore, is not defeated as respondents seem to contend, by the possibility that the averments might fail to state a cause of action on which petitioners could actually recover. For it is well settled that the failure to state a proper cause of action calls for a judgment on the merits and not for a dismissal for want of jurisdiction. Whether the complaint states a cause of action on which relief could be granted is a question of law and just as issues of fact it must be decided after and not before the court has assumed jurisdiction over the controversy. If the court does later exercise its jurisdiction to determine that the allegations in the complaint do not state a ground for relief, then dismissal of the case would be on the merits, not for want of jurisdiction."

■ A case "arises under" the Constitution or the laws of the United States when its decision depends upon the interpretation of the Constitution or federal law, *Cohens v. Virginia,* 6 Wheat. 264, 376, 5 L.Ed. 257 (1821); that is, when the action may be defeated by one construction of the law and sustained by the opposite construction. *Osborn v. Bank of the United States,* 9 Wheat. 738, 821–822, 22 U.S. 738, 821–822, 6 L.Ed. 204 (1824); *Gully v. First National Bank,* 299 U.S. 109, at 112, 57 S.Ct. 96, 81 L.Ed. 70 (1936); *Goldman v. First Federal Savings and Loan Ass'n of Wilmette,* 518 F.2d 1247, 1251 n. 7 (7th Cir. 1975). For the purpose of federal jurisdiction, an "action" is defined in terms of the right asserted, not the remedy sought. *Cohens v. Virginia, supra,* at 379. The right asserted, on which federal jurisdiction depends, must be an essential element of the plaintiff's cause of action. *Gully v. First National Bank, supra; Phillips Petroleum Co. v. Texaco, Inc.,* 415 U.S. 125, 127, 94 S.Ct. 1002, 39 L.Ed.2d 209 (1974).

The clarity of these rules is affected by the degree of directness of a particular statutory command. When the right asserted by a plaintiff is embodied in a direct statutory command, application of the rules is simple. When the right asserted by a plaintiff is embodied in a contract, and it is the contract which results in turn from a statutory command, application is less simple. In the present case, the right asserted, which is the essential element of the plaintiff's cause of action, is the right to compel arbitration of disputes over the making or maintaining of collective bargaining agreements (referred to hereinafter as "interest arbitration"). It is this asserted right upon which federal jurisdiction depends. This asserted right appears expressly in a contract, namely, the 13(c) Agreement. Section 13(c) of the UMTA expressly commands that there be a 13(c) agreement. Section 13(c) does not expressly command the inclusion of a provision for interest arbitration in every 13(c) agreement. Nor does it expressly command that when the inclusion of such a provision is required and when the inclusion then occurs, the vitality of that provision will persist through the life of the UMTA grant.

Because Local 519's complaint alleges that the 13(c) Agreement was entered into "in fulfilment of the City's obligations under § 13(c)," and also alleges that by refusing to proceed to interest arbitration LaCrosse has "breached the specific requirements of the § 13(c) Agreement effectuating [§ 13(c)]," a fair construction of the complaint is that it embodies two claims:

(1) that a federal law, that is, an Act of Congress, § 13(c) of the UMTA, required LaCrosse to enter into a 13(c) Agreement as a condition to the receipt of federal funds for its public transportation program; and

(2) that under the circumstances described in the complaint, § 13(c) required that:

(a) the particular 13(c) Agreement embody a provision for interest arbitration; and

(b) the interest arbitration provision in the 13(c) Agreement remain effective throughout the life of the capital grant contract, whether or not the so-called "conversion agreement" or a succeeding collective bargaining agreement were expressly to embody such a provision.

Each of these "rights" if it exists, is embodied in plaintiff's asserted right to compel interest arbitration and, therefore, is an essential element of Local 519's asserted cause of action. Whether each of these "rights" exists depends upon an interpretation of § 13(c), a federal law.

Claim (1) is neither immaterial, nor made solely to obtain jurisdiction, nor wholly insubstantial or frivolous. On the contrary, it is clearly valid.

It is less clear whether claim 2(a) is valid, that is, whether § 13(c) required that this particular 13(c) Agreement embody an interest arbitration provision. To the extent that the answer to this question may depend upon whether, while the bus operation was in the hands of the private company, interest arbitration occurred, the complaint is silent and the terms of the March 1973–June 1975 collective bargaining agreement are ambiguous. Nevertheless, since the 13(c) Agreement did include such a provision, a claim that its inclusion was required by the statute cannot be considered immaterial, nor made solely to obtain jurisdiction, nor wholly insubstantial or frivolous.

Some uncertainty also marks the validity of claim 2(b), namely, that § 13(c) requires that throughout the life of the capital grant contract there remains in effect the interest arbitration provision embodied in the 13(c) Agreement. I have little doubt that as a matter of construction of the 13(c) Agreement itself, the interest arbitration provision persists throughout the life of the capital grant contract.[3] It is less clear whether

---

**3.** Sections 11 and 17 of the 13(c) Agreement simply do not lend themselves to a contrary construction. In the absence of any jurisdictional challenge at the time, my decision to enter the preliminary injunction was much affected by the feebleness of LaCrosse's argu-

§ 13(c) required language in the 13(c) Agreement affording such durability to the interest arbitration provision. Again, however, since the 13(c) Agreement did include language compelling such a construction, a claim that its inclusion was required by the statute cannot be considered immaterial, nor made solely to obtain jurisdiction, nor wholly insubstantial or frivolous.

Subject matter jurisdiction over Local 519's claim is supported by *International Association of Machinists v. Central Airlines*, 372 U.S. 682, 83 S.Ct. 956, 10 L.Ed.2d 67 (1963). The union and employer had entered into a contract pursuant to section 204 of the Railway Labor Act (45 U.S.C. § 184), establishing a system board of adjustment for the purpose of deciding certain labor disputes. Decisions by the board were to be final and binding. The union presented discharge grievances to the board and received an award ordering reinstatement of the terminated employees. Central Airlines refused to comply with the order, and the union filed suit in federal district court to enforce the board of adjustment award. The sole question before the Supreme Court was whether the controversy arose under a federal statute, either 28 U.S.C. § 1331 or 28 U.S.C. § 1337, or both.

The Court's decision that subject matter jurisdiction existed under both provisions centers on the mandatory nature of the obligation to create the system board of adjustment. The duty to create an adjustment board "was more than a casual suggestion to the air industry"; it was a compulsory, statutory requirement. *Id.* at 686, 83 S.Ct. at 959. Federal question jurisdiction was held to be present because the rights asserted under the congressionally mandated agreement were creations of federal law (*id.* at 692, 83 S.Ct. at 962):

"The contracts and the adjustment boards for which they provide are creations of federal law and bound to the statute and its policy. If any provision contained in a § 204 contract is enforceable, it is because of congressional sanc-

tion: '[T]he federal statute is the source of the power and authority . . . .. The enactment of the federal statute . . . is the governmental action . . though it takes a private agreement to invoke the federal sanction. . . . A union agreement made pursuant to the Railway Labor Act has, therefore, the imprimatur of the federal law upon it . . . .' *Railway Emp. Dept. v. Hanson,* 351 U.S. 225, 232, [76 S.Ct. 714, 100 L.Ed. 1112]."

The point was reiterated later in the opinion (*id.* at 695, 83 S.Ct. at 964):

"The contract of the parties here was executed under § 204 and declares a system board award to be final, binding, and conclusive. The claim stated in the complaint is based upon the award and demands that it be enforced. Whether Central must comply with the award or whether, instead, it is impeachable, are questions controlled by federal law and are to be answered with due regard for the statutory scheme and purpose. To the extent that the contract imposes a duty consistent with the Act to comply with the awards, that duty is a federal requirement. If Central must comply, it is because federal law requires its compliance."

Thus *Central Airlines* stands for the proposition that "arising under" jurisdiction is present where the adjudication of rights asserted under a statutorily required contract depends upon the interpretation of federal law. In *Merchants Despatch Transportation Corporation v. Systems Federation Number One Railway Employees' Department,* 551 F.2d 144, 151 (7th Cir. 1977), overruling *Brotherhood of Railway, Airline and Steamship Clerks v. Special Board of Adjustment No. 605,* 410 F.2d 520 (7th Cir. 1969), cert. denied 396 U.S. 887, 90 S.Ct. 177, 24 L.Ed.2d 162 (1969), the Seventh Circuit has adopted this reading of *Central Airlines.*

LaCrosse attempts to diminish *Central Airlines* by stressing the Supreme Court's

ments for such a contrary construction, and by my lack of success in attempting on my own to

develop a persuasive basis for such a contrary construction of the Agreement.

attention to the history and policy of the Railway Labor Act, in particular to the "need for national uniformity of decisions." Although the overall purpose of the Railway Labor Act informs the result reached in *Central Airlines,* that purpose in no way controls the explicit and limited decision regarding federal subject matter jurisdiction. LaCrosse further seeks to distinguish *Central Airlines* on the ground that it "involved implication of a private remedy from an express grant of Federal jurisdiction" to enforce orders entered by a board which the parties were compelled by statute to create. LaCrosse confuses decision of the jurisdictional issue with decision of an issue whether a private remedy is implied in a statute. Although *Central Airlines* contains language strongly suggesting that there was an implied federal court remedy,[4] that question was not decided.

In *Tunstall v. Brotherhood of Locomotive Firemen and Enginemen,* 323 U.S. 210, 65 S.Ct. 235, 89 L.Ed. 187 (1944), a black fireman sued the railroad and the union in a federal district court complaining of discriminatory application of a labor contract. Two questions were presented: (1) whether the Railway Labor Act, 45 U.S.C. § 151 *et seq.,* granted employees the right to representation by the union, as the bargaining representative, without discrimination on the basis of race; and (2) whether the federal court had jurisdiction to entertain a nondiversity suit in which a railway employee sought to vindicate such a right. The first question had been answered affirmatively in a related case, *Steele v. Louisville & Nashville Railroad Co.,* 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173 (1944), in which an employee had brought suit in a state court. On review in *Steele,* the Supreme Court of the United States held that the state courts had erred in holding that the complaint failed to state a claim upon which relief could be granted. The second

question was answered affirmatively in *Tunstall,* 323 U.S. at 213, 65 S.Ct. at 237:

"We also hold that the right asserted by petitioner which is derived from the duty imposed by the Railway Labor Act on the Brotherhood, as bargaining representative, is a federal right implied from the statute and the policy which it has adopted. It is the federal statute which condemns as unlawful the Brotherhood's conduct. 'The extent and nature of the legal consequences of this condemnation, though left by the statute to judicial determination, are nevertheless to be derived from it and the federal policy which it has adopted.' [citations omitted.] The case is therefore one arising under a law regulating commerce of which the federal courts are given jurisdiction by [28 U.S.C. § 1337 which parallels § 1331] . . . ."

The present case is analogous to *Tunstall.* The right to interest arbitration is not expressly guaranteed by the UMTA just as the right to nondiscriminatory representation by the union was not explicitly guaranteed by the Railway Labor Act. However, Local 519's complaint alleges, not frivolously, that Congress impliedly guaranteed the right to interest arbitration in the circumstances described in the complaint, just as the Court decided in *Steele* that Congress had impliedly guaranteed the right to nondiscriminatory representation by a union. As the controversy in *Steele* was held to have arisen from the Railway Labor Act, so the controversy in the present case is alleged by the complaint, not frivolously, to arise from the UMTA. The success or failure of Local 519's claim will depend upon further interpretation of the UMTA, just as the outcome of Tunstall's claim depended upon interpretation of the Railway Labor Act. Therefore, in each case, one asserting such a claim enjoys access to a federal

4. "It is federal law which would determine whether a § 204 contract is valid and enforceable according to its terms. If these contracts are to serve this function under § 204, their validity, interpretation, and enforceability cannot be left to the laws of the many States, for it would be fatal to the goals of the Act if a contractual provision contrary to the federal command were nevertheless enforced under the state law or if a contract were struck down even though in furtherance of the federal scheme." 372 U.S. at 691, 83 S.Ct. at 961. (footnote omitted).

judicial forum as well as to a state judicial forum for its vindication.[5]

*McFaddin Express, Inc. v. Adley Corp.,* 346 F.2d 424 (2nd Cir. 1965) *cert. denied* 382 U.S. 1026, 86 S.Ct. 643, 15 L.Ed.2d 539 (1966), does not prevent a finding of subject matter jurisdiction in the present case. *McFaddin* dismissed, for lack of federal jurisdiction, a complaint alleging breach of a temporary management contract which had been approved by the Interstate Commerce Commission (ICC) as required by 49 U.S.C. § 310(a), (b). The court acknowledged that § 1331 jurisdiction might exist if the complaint could be read as asserting a substantial claim of violation of the ICC order approving the management contract. *Id.* at 426. The decision turned on the fact that the ICC order, however, did not require the defendants to obey the management contract. It only permitted the parties to enter the contract, by granting a temporary exemption from the restrictions of 49 U.S.C. § 5. Thus, unlike *Central Airlines,* which involved a statutory duty embodied in a private contract, the complaint did not allege breach of an ICC command and,

therefore, did not raise a " 'pivotal question of federal law.' " *Id.* at 426–27.[6]

In *Central Airlines* and *Tunstall* the Court decided that Congress had either expressly created or clearly implied the rights asserted by the respective plaintiffs. In *McFaddin* the court decided that Congress had neither expressly created nor implied the right asserted. In the instant case, the validity of Local 519's assertion of a congressionally implied right to interest arbitration remains undecided. For the purposes of a motion to dismiss for lack of jurisdiction, however, this distinction is not important. The allegations of the complaint, not frivolous, are controlling.

Although *Bradford School Bus Transit v. Chicago Transit Authority,* 537 F.2d 943 (7th Cir. 1976) and *Lloyd v. Regional Transportation Authority,* 548 F.2d 1277 (7th Cir. 1977), are also relied upon by Local 519 in its contention that subject matter jurisdiction is present, I conclude that while these decisions are supportive, neither is directly so.

In *Bradford* a private school bus company sought declaratory and injunctive relief against the Chicago Transit Authority,

5. *Brotherhood of Locomotive Engineers v. Chicago & North Western Railway Company,* 314 F.2d 424 (8th Cir. 1963) presents additional authority for the existence of federal jurisdiction over Local 519's complaint. That case arose from the merger of the Chicago and North Western Railway Company with another railway company, which required the approval of the Interstate Commerce Commission (ICC). The validity of the transaction was statutorily conditioned (by 49 U.S.C. § 5(2)(f)) upon an ICC-approved stipulation between the union and the acquiring company providing for the protection of the interests of railway employees who might be adversely affected by the transaction. After the merger, North Western gave notices of termination to several employees. The union contested this action. North Western insisted that the controversy should be settled pursuant to § 6 of the Railway Labor Act, while the union insisted that the controversy should be settled pursuant to the stipulation. North Western then sought a declaratory judgment on the procedure to be followed in resolving the dispute.

Addressing the question of subject matter jurisdiction, and on the authority of *Gully v. First National Bank, supra,* the court concluded that the case did not involve the interpretation of private collective agreements, but rather involved the interpretation and effect of the Interstate Commerce Act (ICA) section governing protective stipulations (at 428). The analogy between an ICA § 5(2)(f) protective stipulation and a UMTA 13(c) agreement is obvious; in both *Locomotive Engineers* and the instant case these statutorily-mandated agreements assume critical importance in the creation of subject matter jurisdiction. This analogy is strengthened by the direct reference to § 5(2)(f) of the ICA in § 13(c) of the UMTA.

LaCrosse argues that unlike the UMTA, the ICA explicitly granted the federal courts jurisdiction to entertain a limited class of complaints. This jurisdictional provision was not decisive in *Locomotive Engineers;* the court expressly based its jurisdictional ruling upon 28 U.S.C. § 1337 which closely parallels 28 U.S.C. § 1331, the jurisdictional provision invoked here.

6. Although it may appear that the court in *McFaddin Express* reached the merits of the controversy in finding that the ICC did not require obedience to the management contract, a fairer reading of the case is that the court concluded that the assertion of federal question jurisdiction was frivolous and insubstantial as defined in *Bell v. Hood, supra.*

alleging that the Authority had violated an agreement, required by § 1602(g) and § 1602(b) of the UMTA, that it would not engage in school bus operations in competition with private bus companies. Affirming a dismissal of the complaint, the court found that the plaintiff had failed to exhaust administrative remedies established by the Urban Mass Transportation Administration, 49 C.F.R. §§ 605.30–35, but held that the private bus company had standing to challenge the Authority's activities and that the actions of the Administration were judicially reviewable. Although the discussion of the doctrine of primary jurisdiction, 537 F.2d at 949, strongly suggests the existence of federal question jurisdiction over the plaintiff's claim, *Bradford* did not explicitly address, and therefore does not control, the jurisdictional issue raised here.

*Lloyd,* a class action challenging barriers to the use of an Illinois transit system by mobility-disabled persons, offers stronger jurisdictional authority than *Bradford.* The complaint sounded claims under: § 16 of the UMTA (49 U.S.C. § 1612); § 504 of the Rehabilitation Act (29 U.S.C. § 794); §§ 1–2 of the Architectural Barriers Act (42 U.S.C. §§ 4151–4152); and the Fourteenth Amendment. Presumably, jurisdiction rested on 28 U.S.C. § 1331(a).

I conclude that Local 519's complaint, fairly construed, contains the assertion of a right which creates a matter in controversy arising under the laws of the United States, within the meaning of 28 U.S.C. § 1331(a).

## AMOUNT IN CONTROVERSY

■ The complaint fails to allege that the amount in controversy exceeds $10,000 as required by 28 U.S.C. § 1331(a). Although the requirement of the jurisdictional amount is important, a court may exercise jurisdiction in the absence of a specific averment, if the requisite dollar amount can be inferred from the complaint. *State Committee to Stop Sanguine v. Laird,* 317 F.Supp. 664, 667 (W.D.Wis.1970); *Giancana v. Johnson,* 335 F.2d 366, 368 (7th Cir. 1964), *cert. denied,* 379 U.S. 1001, 85 S.Ct. 718, 13 L.Ed.2d 702 (1965).

■ In a case for declaratory judgment or injunctive relief, the amount in controversy is measured by the value of the right to be protected. *City of Milwaukee v. Saxbe,* 546 F.2d 693, 702 (7th Cir. 1976). If the right cannot be translated into pecuniary terms, the complaint fails to meet the jurisdictional requirement of § 1331(a). *Giancana v. Johnson, supra.* To justify dismissal, however, "[i]t must appear to a legal certainty that the claim is really for less than the jurisdictional amount." *St. Paul Mercury Indemnity Co. v. Red Cab Co.,* 303 U.S. 283, 288, 58 S.Ct. 586, 590, 82 L.Ed. 845 (1938); 1 *Moore's Federal Practice* ¶ 0.92[1] at 854–55 (2nd ed. 1977). Difficulty in precise monetary evaluation of the right asserted will not defeat jurisdiction. Absolute certainty that the matter in controversy exceeds $10,000 is not required; a present probability that the value of the matter in controversy will exceed the jurisdictional limit is sufficient. *Scherr v. Volpe,* 336 F.Supp. 882, 885 (W.D.Wis.1971), *aff'd* 466 F.2d 1027 (7th Cir. 1972); *Moore's, supra,* at 855–59.

■ Aggregating the separate claims of the union members, which would be impermissible under *Snyder v. Harris,* 394 U.S. 332, 89 S.Ct. 1053, 22 L.Ed.2d 319 (1969) and *Zahn v. International Paper Co.,* 414 U.S. 291, 94 S.Ct. 505, 38 L.Ed.2d 511 (1973), is not necessary to satisfy the amount in controversy. Local 519, not the individual employees of the Transit Utility, is party to the 13(c) Agreement and the present litigation. There is no question that Local 519 has standing in its representative capacity to assert the claims of its members to interest arbitration. *Warth v. Seldin,* 422 U.S. 490, 511, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). The Supreme Court has held that where a representative organization, such as a trade association, has standing to litigate claims on behalf of its constituents, it may also rely on those claims to meet the jurisdictional amount in controversy. *Hunt v. Washington Apple Advertising Commission,* No. 76–63, decided June 20, 1977, slip opinion at 12. Finding that a state agency, designed to protect and promote the Wash-

ington apple industry, had standing to challenge a North Carolina packaging regulation, the Court concluded that it was "unnecessary to reach the aggregation question posed by the appellants for it does not appear to us 'to a legal certainty' that the claims of at least some of the individual growers and dealers will not amount to the required $10,000." *Id.*

The core of Local 519's complaint is its right to compel arbitration of the disputed terms of a new collective bargaining agreement. Although this right may not be easily converted into a specific dollar amount, assessment of its pecuniary value is not impossible. Responding to a union demand for arbitration of wage rates under a collective bargaining agreement, the Second Circuit held that a court should look to the possible award resulting from the desired arbitration to determine the amount in controversy. *Davenport v. Procter & Gamble Manufacturing Co.,* 241 F.2d 511, 514 (1957), cited approvingly in *Moore's, supra,* ¶ 0.92[5] at 880. In its request for interest arbitration, Local 519 seeks a new collective bargaining agreement. The value of that contract includes the value of the benefits such as wages, cost of living adjustments, vacation pay, sick leave allowance, health insurance, life insurance, job security, seniority rights and pension plan interests to be provided therein. The exhibits attached to the complaint, in particular the collective bargaining agreement dated March 1973 and the arbitration award dated April 9, 1976, present ample evidence that the value of a new contract, at least for some of the union members, will exceed $10,000. See *Hunt, supra.* Therefore, I find that the amount in controversy requirement of § 1331(a) is satisfied.

## ABSTENTION

LaCrosse urges this court to abstain from exercising its jurisdiction, if jurisdiction is present, in "scrupulous regard for the rightful independence of state governments." *Matthews v. Rodgers,* 284 U.S. 521, 525, 52 S.Ct. 217, 219, 76 L.Ed. 447 (1932). LaCrosse considers abstention appropriate because Wisconsin law allegedly provides an adequate mechanism for resolving collective bargaining disputes between a public entity and its employees.

*Burford v. Sun Oil Co.,* 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943); *Alabama Public Service Commission v. Southern Ry. Co.,* 341 U.S. 341, 71 S.Ct. 762, 95 L.Ed. 1002 (1951), and *Kelly Services, Inc. v. Johnson,* 542 F.2d 31 (7th Cir. 1976), relied upon by LaCrosse, are not applicable to the present case. The principle underlying these decisions is "that exercise of federal review . . . would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern." *Colorado River Water Cons. Dist. v. United States,* 424 U.S. 800, 814, 96 S.Ct. 1236, 1245, 47 L.Ed.2d 483 (1976). I appreciate that the State of Wisconsin has undertaken to develop a statutory and administrative scheme to govern the relationships between local governments and their employees. It may be thought that by requiring interest arbitration in the circumstances described in this complaint, if indeed it has so required, Congress has disrupted Wisconsin's statutory and administrative scheme. But if it is determined that Congress has imposed such a requirement, the disruption results from the congressional action and not from the ensuing judicial determination that the requirement has been imposed and must be obeyed. Federal court adjudication, rather than state court adjudication, of Local 519's right to interest arbitration under § 13(c) of the UMTA neither adds to nor subtracts from any such disruption. Unlike the plaintiffs in the *Burford* line of cases, Local 519 does not contend that a state statutory scheme, as applied, violates its federal rights. Local 519 simply asserts a federal right to interest arbitration which is not provided by Wisconsin law.[7] Nor is abstention appropriate

---

7. *Surowitz v. New York City Employees Retirement System,* 376 F.Supp. 369 (S.D.N.Y.1974), cited by defendants, involved a civil rights action by a former city employee for a declaration with respect to retirement benefits. Finding a lack of federal jurisdiction, the court did not decide the case on abstention grounds.

under *Railroad Commission of Texas v. Pullman Co.*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941). The unsettled question is one of federal, not state, law. A federal court, quite as much as a state court, is empowered to decide it.

## IMPLICATION OF REMEDY FOR LOCAL 519

 LaCrosse's principal contention in this case is that Local 519 enjoys no remedy in a federal district court for LaCrosse's alleged failure to engage in interest arbitration. LaCrosse asserts that the absence of such a remedy would deprive this court of subject matter jurisdiction. For reasons stated at the outset of this opinion, I disagree but will nevertheless express my view on the question of the presence or absence of a remedy.

With respect to an alleged violation of § 13(c), the UMTA does not expressly make such conduct criminal, nor subject it to civil penalties, nor provide for the termination of the grant of federal funds because of it, nor establish administrative machinery to remedy it, nor provide a judicial remedy for an aggrieved party. Thus, the questions are whether Congress implied that under the circumstances described in Local 519's complaint, the union enjoys a remedy; if so, whether the remedy is judicial; and, if so, whether that judicial remedy is available in a federal court.

LaCrosse relies heavily upon *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), understandably so, since the opinion is recent and bears indicia of an attempt by the Court to deal definitively with the subject of congressional implication of remedies. I will turn to *Cort v. Ash* in a moment, but, because I believe it anomalous to apply to the present case the particular combination of tests enunciated in *Cort v. Ash*, I will consider the problem initially without specific reference to the tests in *Cort v. Ash*.

*Does Local 519 enjoy a remedy?*

The UMTA is not a regulatory statute. It represents an exercise of the federal spending power to deal with urban mass transit. It employs the device of attaching conditions to the grants of money, so that municipalities like LaCrosse may choose whether to accept the money and the conditions or to forego both. Among the conditions expressly decreed by Congress are the conditions "that fair and equitable arrangements are made, as determined by the Secretary of Labor, to protect the interests of employees affected by such assistance," and that the grant contract "shall specify the terms and conditions of the protective arrangements." 49 U.S.C. § 1609(c) (§ 13(c)). Congress contemplated the use of contracts as the vehicle by which the fair and equitable arrangements would be made. And, in a case in which the "employees affected" are represented by a union, it contemplated that the contract would be one to which the union is a party. Resort to "13(c) Agreements," capital grant contracts, and "conversion agreements" is wholly consistent with the purposes and terms of the Act. Congress intended that the contracts embodying the "fair and equitable arrangements" were to be enforceable contracts. It would be fatuous to suggest otherwise. Because the contracts were to be enforceable, it follows that they were to be enforced at the instance of the parties to the contracts. Therefore, the answer to the threshold question is clearly that Congress implied that Local 519 would enjoy a remedy in the circumstances described in its complaint.

*May the remedy be sought in a judicial, rather than administrative, forum?*

Municipal employers are excluded from coverage under the Labor Management Relations Act, 29 U.S.C. § 152(2), and Congress has created no administrative apparatus within the UMTA to deal with labor relations matters affecting municipalities which are grant recipients and their employees. Therefore, if Congress intended

that, in the circumstances described in the complaint, unions must seek a non-judicial remedy for the public employers' alleged failures to honor agreements to arbitrate, it must have intended that the non-judicial forums would be those which particular states may or may not have created for labor relations matters affecting municipal employees.

As I have stated earlier, the theory of the present case, upon which jurisdiction under 28 U.S.C. § 1331(a) depends, is that under the circumstances described in the complaint, Congress required through § 13(c) that the 13(c) Agreement embody a provision for interest arbitration. It is incongruous that in imposing such a requirement, Congress would have chosen to permit its enforcement to depend exclusively, state by state, upon the existence or non-existence of state administrative machinery capable of compelling a party to abide by an agreement to arbitrate in the manner described in a contract. For that matter, it is also incongruous that Congress would have chosen to permit the enforcement of the congressionally-required provision of a contract to depend exclusively upon the judgment of state agencies, even where they do exist.

I appreciate that in enacting the UMTA, Congress did not intend to displace state regulation in the whole range of the relations between municipal transit employees and those municipal employers who may accept UMTA grants. But the immediate question bears upon a specific sector of those employee-employer relations, namely, that in which the parties are alleged to have agreed to arbitrate disputes in a manner described in the contract. When Congress enacted the UMTA, it can be presumed to have been well aware that courts, as contrasted with administrative agencies, have been considered appropriate forums in which to seek orders compelling obedience to agreements to arbitrate. *See*, Arbitration Act, 9 U.S.C. § 4; Labor Management Relations Act § 301(a), 29 U.S.C. § 185(a); *Textile Workers Union v. Lincoln Mills,* 353 U.S. 448, 455, 456–57, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957); *International Union of Operating Engineers, Local No. 139 v. Carl A. Morse,* 529 F.2d 574 (7th Cir. 1976); *Chattanooga Mailers v. Chattanooga News-Free Press,* 524 F.2d 1305, 1315 (6th Cir. 1975).

I conclude that when circumstances exist which trigger a congressional requirement that a 13(c) Agreement embody a provision for interest arbitration, and when the 13(c) Agreement then does include a provision for interest arbitration by a non-governmental arbitrator, and when a party to this contractual provision allegedly fails to honor it, Congress implied that the remedy may be sought in a judicial forum.

### May the judicial forum be a federal court?

No reason suggests itself why Congress might have implied that in the circumstances described in the present complaint, the judicial forum in which the remedy is sought must be a state court rather than a federal court. As I observed in discussing the abstention question, either Congress has imposed an interest arbitration requirement in these circumstances, or it has not. If such a requirement disrupts Wisconsin's statutory and administrative scheme relating to disputes in public employment, the disruption results from the congressional action and not from the ensuing judicial determination that the requirement has been imposed by Congress and that it must be obeyed. If it were necessary, which it is not, that this question of federal law be decided only by state courts or only by federal courts, the federal courts would be more appropriate. In the circumstances described in the present complaint, I conclude that Congress implied that the judicial forum in which Local 519 may seek its remedy may be a federal court.

### The Cort v. Ash tests

 I turn to *Cort v. Ash,* 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), to see whether it requires a different analysis or result than that just stated. *Cort* involved a federal criminal statute prohibiting corporations from making contributions or expenditures in connection with presidential

elections. The question was whether Congress had implied a damage remedy for a stockholder in a private action against the directors alleging that they had authorized an expenditure prohibited by the statute. The Supreme Court's answer was no. The contrast between *Cort* and the present case is marked. In *Cort* the statute was a regulatory prohibition against certain conduct, imposing criminal sanctions for its violation. In the present case the statute is not a regulatory prohibition against certain conduct, and it imposes no sanctions for its violation; rather, it authorizes grants to municipalities like LaCrosse upon a condition that certain protective arrangements for workers be embodied in certain contracts. Nevertheless, in broad language relating to congressionally implied remedies, the Court described (422 U.S. at 78, 95 S.Ct. at 2088) the following four tests, which I will undertake to apply to the present case:

"First, is the plaintiff 'one of the class for whose *especial* benefit the statute was enacted,' *Texas & Pacific R. Co. v. Rigsby,* 241 U.S. 33, 39, [36 S.Ct. 482, 60 L.Ed. 874] (1916) (emphasis supplied)—that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? See, *e.g., National Railroad Passenger Corp. v. National Assn. of Railroad Passengers,* 414 U.S. 453, 458, 460, [94 S.Ct. 690, 38 L.Ed.2d 646] (1974) (*Amtrak*). Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? See, *e.g., Am-*

*trak, supra; Securities Investor Protection Corp. v. Barbour,* 421 U.S. 412, 423, [95 S.Ct. 1733, 44 L.Ed.2d 263] (1975); *Calhoon v. Harvey,* 379 U.S. 134, [85 S.Ct. 292, 13 L.Ed.2d 190] (1964). And finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law? See *Wheeldin v. Wheeler,* 373 U.S. 647, 652, [83 S.Ct. 1441, 10 L.Ed.2d 605] (1963); *cf. J. I. Case Co. v. Borak,* 377 U.S. 426, 434, [84 S.Ct. 1555, 12 L.Ed.2d 423] (1964); *Bivens v. Six Unknown Federal Narcotics Agents,* 403 U.S. 388, 394–395, [91 S.Ct. 1999, 29 L.Ed.2d 619] (1971); *id.* at 400, [91 S.Ct. at 2006] (Harlan, J., concurring in judgment)."

1. *Was the UMTA enacted for the especial benefit of labor organizations such as Local 519?*

Although the overall goal of the UMTA is to assist, preserve, expand, and improve mass transit, 49 U.S.C. §§ 1601, 1601a, 1601b, the explicit purpose of § 13(c) is to guarantee the rights of workers affected by the grant program.[8] The protection of collective bargaining rights, existing at the time of the conversion of a transit company from private to public status, was the primary motive behind the amendment to the UMTA which ultimately became § 13(c).[9] See remarks of Senator Javits, 109 Cong. Rec. 5422, 5684; Senator Morse, 109 Cong. Rec. 5670–5671, 5672, 5676, 5677, 5684; Senator Lausche, 109 Cong.Rec. 5677; Senator

8. "The principle of protecting workers affected as a result of adjustments in an industry carried out under the aegis of Federal law is not new, particularly in the transportation industry. Thus, railroad employees for years have enjoyed Federal protection against adverse effects attendant upon railroad consolidations. The problems of worker protection presented by the bill are not necessarily identical to those presented under other laws. The committee believes, however, that workers for whom a standard of benefits has already been established under other laws should receive equally favorable treatment under the proposed new program. The committee also believes that all workers adverse-

ly affected by adjustments effected under the bill should be fully protected in a fair and equitable manner, and that Federal funds should not be used in a manner that is directly or indirectly detrimental to legitimate interests and rights of such workers." U.S. Code of Cong. & Admin.News 1964, Vol. 2 at 2584.

9. Section 13(c) of the UMTA originally was labelled § 10(c) of Senate Bill 6, was replaced with § 19(c) passed as § 10(c) of the UMTA and finally was renumbered § 13(c). Pub.L. 89–562, § 2(a)(1), (b)(2), September 8, 1966 (80 Stat. 715, 716).

Williams, 109 Cong.Rec. 5678; Representative Rains, 110 Cong.Rec. 14906, 14976. Even the opponents of the amendment conceded that its basic purpose was to protect collective bargaining rights. See remarks of Senator Goldwater, 109 Cong.Rec. 5673; Senator Clark, 109 Cong.Rec. 5674, 5679; Senator Tower, 109 Cong.Rec. 5679; and Representative Taft, 110 Cong.Rec. 14921.

In *McDaniel v. University of Chicago*, 548 F.2d 689, 693 (7th Cir. 1977), the court noted that a plaintiff class may be especial beneficiaries for the purposes of a *Cort* analysis without being the exclusive beneficiaries under a statute. *McDaniel* inferred from the Davis-Bacon Act (40 U.S.C. § 276a *et seq.*) a private right of action on behalf of a laborer against a university, as a government contractor, to enforce the university's commitment to pay the prevailing wage. The court found that such an inference was necessary to effectuate the intent of Congress in enacting the Davis-Bacon Act. Thus, that the LaCrosse transit employees are not the exclusive, nor even the primary, beneficiaries of the UMTA as a whole does not mean that they are not members of a class for whose especial benefit § 13(c) was enacted.

## 2. *Is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one?*

The legislative history of § 13(c) does not appear to contain mention of procedures for enforcing the rights protected by § 13(c). Concern with the potential conflict between state and federal law, particularly with regard to the right to strike, is articulated. See 109 Cong.Rec. 5421, remarks of Senators Miller, Tower, and Williams; 109 Cong. Rec. 5322–5323, Senator Tower; 109 Cong. Rec. 5673–5674, Senators Morse and Goldwater; 110 Cong.Rec. 14906, Representative Rains; 110 Cong.Rec. 14977, Representative Taft; 110 Cong.Rec. 14980, Representative Multer; 110 Cong.Rec. 14983, Representative Talcott. Some thought the threat of such conflict serious; others thought it insignificant. No one, however, suggested how a conflict between state and federal laws, with regard to either rights or remedies, was to be resolved. Thus, these discussions are silent on how federally conferred rights were to be vindicated.

## 3. *Is an implied remedy for Local 519 consistent with the underlying purpose of the UMTA?*

The underlying purposes of the UMTA are to assist, preserve, expand, and improve mass transit. 49 U.S.C. §§ 1601, 1601a, 1601b. LaCrosse contends that the realization of these purposes would be impeded or frustrated on a national scale by federal judicial enforcement of a requirement of interest arbitration between municipal transit workers and municipalities which are the recipients of UMTA grants: management decisions would be subject to federal judicial scrutiny repeatedly if not continuously; fiscal planning would be removed from the hands of municipal officials into the hands of arbitrators responsible only to the courts and not to the parties or to the people served by the parties; intransigence in bargaining might result in additional costs to the municipality and to the consumers.

These anxieties may or may not be well founded, but they seem wholly irrelevant. They would be relevant to a debate in Congress on whether to require interest arbitration as a condition of UMTA grants under all circumstances, under no circumstances, or under some circumstances. They are also relevant to an important and presumably disputed issue in this case: whether Congress implied that in the circumstances described in the complaint, the inclusion of interest arbitration in a 13(c) Agreement was required by § 13(c). One might believe that because the consequences of such a congressional requirement would be so baleful for mass transit, Congress should be presumed not to have imposed impliedly such a requirement in any set of circumstances. But the plaintiff contends, not frivolously, as I have found, that by implication in § 13(c), Congress did impose such a requirement in the circumstances described in the complaint. The

immediate issue is whether, assuming that plaintiff is correct and that Congress did impose such a requirement in the circumstances alleged here, Congress also implied that a party to the 13(c) Agreement is entitled to the remedy of compelling the other party to abide by it. To the extent that LaCrosse addresses this question, it seems to contend that even if Congress implied that, in the circumstances alleged here, provision for interest arbitration must be embodied in the 13(c) Agreement, the damage to the purposes of the UMTA resulting from that requirement is so grievous that Congress must be held to have intended to refrain from providing the means to enforce the requirement. I doubt that the rules of statutory construction permit a court to impute to a legislative body such weakness of spirit.

There is a suggestion by LaCrosse that any federal governmental intrusion in urban mass transit, beyond the provision of federal funds, is inimical to the purposes of the UMTA. Perhaps so, but Congress plainly did not share this view. Federal supervision of the capital grant program is inherent in the Act. Various sections of the statute are implemented under the direction of an agency of the United States Department of Transportation. See 49 U.S.C. § 1602(g), 49 C.F.R. § 605.1 *et seq.* regarding school bus operations; 49 U.S.C. § 1612, 49 C.F.R. § 609.1 *et seq.* regarding transportation services for elderly and handicapped persons; 49 C.F.R. § 604.10 *et seq.* regarding charter bus agreements; and 49 C.F.R. § 603.1 *et seq.* regarding collection of claims arising under the Act. The federal regulations governing school and charter bus arrangements are also subject to federal judicial review in accordance with the Administrative Procedure Act, 5 U.S.C. §§ 701–706. See 49 C.F.R. § 605.35 and § 604.45. Section 13(c) itself envisions federal oversight: the agreement required under that provision must be approved by the Secretary of Labor.

Unlike the other sections just mentioned, however, § 13(c) provides no administrative mechanism or remedial provisions for its enforcement. The lack of express provision for such remedies in § 13(c), combined with the mandatory nature of the section, strongly suggests the need for a federal cause of action. The Seventh Circuit has reached a similar conclusion in *Lloyd v. Regional Transportation Authority,* 548 F.2d 1277 (1977), cited earlier in this opinion, where the court inferred a private cause of action under § 504 of the Rehabilitation Act, 29 U.S.C. § 794, on behalf of a class of mobility-impaired persons who claimed that, in violation of the UMTA, 49 U.S.C. § 1612, they were prevented from using an Illinois mass transit system. In finding that the four-pronged test of *Cort v. Ash* was met, the court observed (548 F.2d at 1286):

"When administrative remedial machinery does not exist to vindicate an affirmative right, there can be no objection to an independent cause of action in the federal courts. [Footnote and citation omitted]."

Although *Lloyd,* with its express indication of legislative intent to create a judicial remedy (at 1286), arguably presents a stronger case for the implication of a private cause of action than does the instant case, *Lloyd's* emphasis on the absence of administrative procedures to redress statutory violations provides authority for inferring a private remedy under § 13(c).

It was on this point of administrative remedies that the Seventh Circuit distinguished its prior decisions of *Bradford School Bus Transit, Inc. v. Chicago Transit Authority,* 537 F.2d 943 (1976), cited earlier in this opinion, and *Cannon v. University of Chicago,* 559 F.2d 1063 (7th Cir., decided on rehearing August 9, 1977).[10] *Bradford* was dismissed because the plaintiff had failed to exhaust the administrative procedures provided under the UMTA. 49 U.S.C. § 1602(g). *Cannon* involved a sex discrimination claim against the University of Chi-

10. *Lloyd* discussed and distinguished the first *Cannon* decision, 559 F.2d 1063, 7th Cir., decid- ed August 27, 1976. I am considering only the decision on rehearing.

cago under Title IX of the Education Amendments of 1972 (20 U.S.C. § 1681). The statute, as well as its companion regulations, provided private parties with recourse to an administrative rather than a judicial forum for review of sex discrimination complaints. The court held that Title IX does not permit inference of a private remedy by direct suit in a federal district court. It stressed the "sophisticated scheme of administrative enforcement and judicial review, that, if given an opportunity to work, may well prove itself adequate to the task for which Congress designed it." (at 1082.) The critical importance of the existence or absence of administrative remedies is highlighted at the end of the opinion:

> "Were we confronted with an alleged violation of a fundamental federal constitutional or statutory right for which Congress has provided no remedy at all, or for which the remedies available have proven to be wholly inadequate to the task of protecting those rights, we might take a different view of the matter. E. g. Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388, 390–97, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971); Steele v. Louisville & Nashville R. R., 323 U.S. 192, 206–07, 65 S.Ct. 226, 89 L.Ed. 173 (1944); Lloyd v. Regional Transportation Authority, 548 F.2d 1277, 1285–87 (7th Cir. 1977)."

A further clue to the construction of the UMTA with respect to the implication of a remedy, is the reference in § 13(c) to a provision of the Interstate Commerce Act (49 U.S.C. § 5(2)(f)):

> "Such arrangements shall include provisions protecting individual employees against a worsening of their positions with respect to their employment which shall in no event provide benefits less than those established pursuant to section 5(2)(f) of this title."

Section 5(2)(f) provides that the Interstate Commerce Commission (ICC) "shall require a fair and equitable arrangement to protect the interests of the railroad employees affected" by the merger, consolidation or other acquisition of control of carriers regulated by the statute. The strong connection between § 5(2)(f) and § 13(c) surfaces in the legislative history of the UMTA, both in the Senate, 109 Cong.Rec. 5675–5676, 5677, 5680, and in the House, 110 Cong.Rec. 14977, 14978.

Like § 13(c), § 5(2)(f) does not specify a remedy for transportation workers. However, the existence of such a private remedy has been silently inferred by a number of courts in federal cases raising employee claims of violations of § 5(2)(f) safeguards. See Nemitz v. Norfolk and Western Railway Company, 436 F.2d 841 (6th Cir. 1971), aff'd 404 U.S. 37, 92 S.Ct. 185, 30 L.Ed.2d 198 (1971), holding that the district court had subject matter jurisdiction over a claim for damages and an injunction stemming from alleged violation of an ICC order which incorporated a § 5(2)(f) agreement and that the determination of damages by arbitration rather than by court adjudication was improper; Parsons v. Norfolk and Western Railway Company, 442 F.2d 1075 (4th Cir. 1971), holding that employees must first exhaust contractual rights of arbitration and statutory remedies in the Railway Adjustment Board before coming to federal court; O'Mara v. Erie Lackawanna Railroad Co., 407 F.2d 674, 678 (2nd Cir. 1969), aff'd sub nom. Czosek v. O'Mara, 397 U.S. 25, 90 S.Ct. 770, 25 L.Ed.2d 21 (1970), holding that § 5(2)(f) does not prevent discharge but relates only to the question of compensation upon discharge, and affirming a dismissal for failure first to submit the dispute to the Railway Adjustment Board; Louisville & Nashville Railroad Co. v. Cantrell, 215 F.Supp. 229 (M.D.Tenn.1962), granting the employer a declaratory judgment that the employees were obliged to submit a dispute to arbitration as provided in the implementing agreement; United Transportation Union Local Lodge # 693–E and Local Lodge # 77 v. Burlington Northern Inc., 319 F.Supp. 451 (D.Minn.1970), issuing a temporary injunction to preserve the status quo pending an ICC determination; McLaughlin v. Penn Central Transportation Co., 384 F.Supp. 179, 182–183 (S.D.N.Y. 1974), holding that an employee's complaint

failed to state a claim for violation of § 5(2)(f) because it did not involve an ICC order approving merger or consolidation and that plaintiffs had failed to exhaust administrative procedures.

Of the decisions just cited, only *Louisville & Nashville Railroad Co v. Cantrell* was decided prior to 1964, when § 13(c) of the UMTA was first enacted. It would be unreasonable to suggest that the Congress enacted § 13(c) in conscious awareness of the holding. However, that so many courts have inferred from § 5(2)(f) the existence of private remedies in federal courts is supportive of the proposition that a similar inference from § 13(c) of the UMTA would be valid.

Of course, the best key to construction of § 13(c), so obvious in my view as to be dispositive of the issue, is that § 13(c) clearly contemplates contracts as the vehicles embodying the "fair and equitable arrangements;" that contracts are meant to be enforceable, not unenforceable; and that enforceability means the existence of some remedy in some forum.

4. *Is the cause of action, said to have been implied by Congress, one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law?*

I find it difficult to understand how this *Cort* test can be relevant to the present case. If one were to assume that the "area" of interest arbitration in state and local public employment, generally, is an area basically the concern of the states, and if one were to assume also that Congress had expressly invaded it by requiring interest arbitration as a condition to federal grants in aid, generally, it seems odd to inquire whether a cause of action to compel the congressionally required arbitration is "one traditionally relegated to state law, in an area basically the concern of the States." It seems no less odd to engage in such an inquiry when the congressional imposition of the requirement itself is implied, as is

alleged here, rather than expressed. Nevertheless, I will attempt the inquiry.

A cause of action for judicial enforcement of an agreement to submit disputes to arbitration is not one which has been "traditionally relegated" either to federal law or to state law. One must always look to the context and to the substance of the controversy in order to determine whether success in obtaining such a remedy turns upon federal law or state law. This question has been explored at length earlier in this opinion.

Whether the remedy sought in the present case is "in an area basically the concern of the States" is a question of some difficulty. At least two "areas" are involved: urban mass transit, and labor-management relations in transportation. Within the area of labor-management relations, two "sub-areas" are involved: private employment in transportation and state and local public employment in transportation.

There is no difficulty in determining that urban mass transit is "an area basically the concern of the" nation. Congress has so declared in the preamble to the UMTA. 49 U.S.C. §§ 1602, 1601a, 1601b. See also U.S. Code Cong. & Admin.News, 1964, Vol. 2, pp. 2572–2574.

Nor is there difficulty in determining either that labor-management relations in private employment in transportation is an area basically the concern of the nation or that labor-management relations in state and local public employment generally is an area basically the concern of the states. See Labor Management Relations Act, 29 U.S.C. § 152(2).

Obviously, the present case involves urban mass transit, an area basically the concern of the nation. It involves employees whose relations with private management were an area basically the concern of the nation, but whose present relations with municipal management are in an area which traditionally has been basically the concern of the states. This dilemma exists because Congress chose, through the UMTA, to make federal funds available to

municipalities for the very purpose of transforming private enterprises in the area of urban mass transit into public enterprises.

The congressional history of the UMTA in general and § 13(c) in particular reveals that members of the Senate and House were conscious of the dilemma. Numerous references were made to the local character of employment issues under the UMTA. The Senate Report states that ". . . specific conditions for worker protection will normally be the product of local bargaining and negotiation." U.S.Code Cong. & Admin.News 1964, Vol. 2, pp. 2584–2585. The primacy of state law was stressed in the lengthy colloquy between Senators Goldwater and Morse regarding the conflict between state and federal law over the right to strike. Senator Goldwater expressed grave concern that the collective bargaining to be continued under the UMTA not include the right to strike. 109 Cong.Rec. 5672–5673. Senator Morse assured the Senate that a state ban against public employee strikes would supersede national labor policy as to the right to strike, but only as to this right; all other collective bargaining rights would be protected. 109 Cong.Rec. 5673. The discussion of the right to strike includes a statement by Senator Morse that "it [the amendment which became § 13(c)] deals with municipal and State problems, and not with Federal problems." Id. For the House counterpart to this discussion, see 110 Cong.Rec. 14903 (Taft); 14906 (Rains); 14911–12.

While such remarks lend force to the contention that § 13(c) addresses traditionally state concerns, they should not be read out of context, which was the matter of strikes by public employees. Nor do such isolated statements override the essential proposition that § 13(c) was consciously designed to protect the national interest in the stability of labor-management relations in urban mass transit systems, whether privately or publicly operated, and that the protection of this national interest required the continued assertion of national labor policy when a system was transferred from private to public operation. As sponsor of § 13(c), Senator Morse made this explicit (109 Cong.Rec. 5670):

"Paragraph 19(c) [now § 13(c)] concerns the protective arrangements respecting interests of employees affected by the bill. As we know, any legislation which is intended to provide Federal aid for the purpose of strengthening and improving our urban area mass transportation systems must be concerned with another highly important factor, the stability of labor relations. It is a necessary corollary of any such consideration that there be provisions which would safeguard employee rights and promote and maintain the national labor policy with a view toward insuring labor relations stability and promoting employee morale."

Thus, § 13(c) sought to protect labor rights existing under federal law, except the right to strike, by preserving them in a different form, namely the agreements required by § 13(c). At least one Senator voiced opposition to the provision on the basis of its uncertain legal consequences, including the possibility that the section might be construed to amend the exclusion of government operations from the provisions of the Labor Management Relations Act. See remarks of Senator Clark, 109 Cong.Rec. 5674–5675; also see remarks of Senator Lausche, 109 Cong.Rec. 5676. From the congressional history, it cannot be said that there emerged a clear consensus as to the resolution of every dimension of the dilemma which underlies § 13(c). But these uncertainties do not negate that the fundamental purpose of § 13(c) is to secure the federally-created labor rights of employees in private transportation in their transition to public employment. In this respect, national labor policy predominates. Therefore, it is reasonable to infer that Congress intended to create a cause of action to vindicate federal rights guaranteed by § 13(c).

LaCrosse contends, however, that to ascribe such an intention to Congress is impermissible in light of National League of Cities v. Usery, 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976). National League of Cities invalidated, as overreaching the com-

merce power, the extension of the Fair Labor Standards Act's minimum wages and maximum hours provision to employees of the states and their political subdivisions. LaCrosse contends that a private remedy to compel interest arbitration between municipal transit workers and a municipality would displace local policies concerning the manner in which the city has decided to deliver government services and thus would impermissibly "restructure traditional ways in which the local government [has] arranged [its] affairs." *National League of Cities, supra,* at 849, 96 S.Ct. at 2473. Congressional implication of a private remedy, LaCrosse warns, would have eroded "functions essential to separate and independent existence" of the states. *National League of Cities, supra,* at 845, 96 S.Ct. at 2471, quoting from *Coyle v. Oklahoma,* 221 U.S. 559, 31 S.Ct. 688, 55 L.Ed. 853 (1911).

Unlike the instant case, *National League of Cities* involves a constitutional challenge to an attempted exercise of the congressional commerce power and therefore is not directly apposite. The validity of conditions, such as those imposed by § 13(c) of the UMTA, in an attempted exercise of congressional spending power under Article I, § 8, clause 1 of the Constitution was expressly left undecided in *National League of Cities* (426 U.S. at 852, n. 17, 96 S.Ct. 2474):

"We express no view as to whether different results might obtain if Congress seeks to affect integral operations of state governments by exercising authority granted it under other sections of the Constitution such as the spending power, Art. I, § 8, cl. 1, or § 5 of the Fourteenth Amendment."

LaCrosse does not appear to contend, presently at least, that in this case the constitutional issue bearing on the spending power, reserved in *National League of Cities,* should be reached and decided. Rather, it seems to contend that in the application of the fourth *Cort* test to the present case, attention must be given to statements in *National League of Cities,* such as the following (426 U.S. at 855, 96 S.Ct. 2475):

"Congress may not exercise [the commerce] power so as to force directly upon the States its choice as to how essential decisions regarding the conduct of integral governmental functions are to be made."

That is to say, it seems to contend that in the face of such statements in *National League of Cities,* Congress should not be considered to have risked constitutional problems by impliedly intervening too strongly in state and local affairs.

As I have observed repeatedly, such a contention is relevant to the question whether Congress impliedly required in § 13(c) that, in the circumstances of this case, the 13(c) Agreement must embody a provision for interest arbitration. It seems quite irrelevant to the question whether, assuming that Congress did impose such a requirement by implication, Congress also implied that Local 519 enjoys the remedy of compelling the public employer to submit to interest arbitration. Nevertheless, once again, I will make an assumption of relevance.

Congress was well aware of the nature of the conditions it was imposing by § 13(c) upon the governmental recipients of UMTA grants. Senator Morse stated (109 Cong. Rec. 5675):

"It is impossible to satisfy all Senators. The reason why it is impossible to satisfy them all is that we cannot satisfy each instance and protect the Federal policy, because some changes are going to have to be brought about in some of the States to conform to the Federal policy.

"I do not think there would be any great wrong done if we simply said to a State, 'You do not qualify for this Federal grant.' It does not mean they are entitled, as a matter of right, to the Federal grants irrespective of the fact that they are not following a policy that is in conformity with a Federal policy which I think is sound public policy."

The question seems to be whether Congress risked, at least, violation of the Constitution by imposing these conditions upon govern-

mental recipients of grants, particularly by imposing in the circumstances described in this complaint, as Local 519 asserts that it did, the requirement of interest arbitration. I will refrain from extended discussion of this point. My view is simply that it is not unduly coercive to attach such a condition to a grant which the municipality is free to accept or to forego. See *Steward Machine Co. v. Davis*, 301 U.S. 548, 585, 57 S.Ct. 883, 81 L.Ed. 1279 (1937). The risk of violation of the Constitution was not present when Congress considered § 13(c). There is no basis for an assumption that fear of such a violation dissuaded Congress from implying in § 13(c) that, under the circumstances described in the present complaint, the 13(c) Agreement must include provision for interest arbitration.

Thus, the application of *Cort's* fourth test permits the conclusion that it would not be inappropriate to infer from the UMTA a cause of action by Local 519 based solely on federal law.

## RECENT DECISIONS BY OTHER COURTS

In *Division 580 v. Central New York Regional Transportation Authority*, 556 F.2d 659 (2nd Cir. 1977), the union sought to enjoin the Authority from imposing a resolution of a labor dispute in accordance with New York state law. Both the union and the transit authority initially had asked for assistance from the state Public Employment Relations Board. After reaching an impasse, however, the union requested that the contract dispute be submitted to arbitration pursuant to the 13(c) Agreement between it and the authority which contained a provision similar to § 11 of the 13(c) Agreement between Local 519 and LaCrosse. *Id.* at 661. The court of appeals affirmed the district court's denial of a preliminary injunction on the grounds that the union was unlikely to succeed on the merits "in demonstrating that the 13(c) Agreement committed the parties to interest arbitration when no prior agreement between the parties ever provided for it." *Id.* at 662. In reaching the substance of the

union's motion, the court of appeals silently assumed jurisdiction over the subject matter of the complaint. In addition, the decision of the court of appeals in *Division 580* is weak precedent on the question of inferring a cause of action from § 13(c). The court noted that a final determination of the issues was beyond its role and that the record was "insufficient to permit such a determination to be made." *Id.*

In an opinion and order, as yet unreported, by the United States District Court for the Northern District of New York, Index No. 77–CV–45, dated October 19, 1977, on the hearing on remand in *Division 580, Amalgamated Transit Union v. Central New York Regional Transportation Authority*, the court dismissed the action for lack of jurisdiction. It held that the case did not arise under federal law because it did not require construction of a federal statute. The court indicated that it believed *McFaddin, supra,* and *Cort v. Ash, supra,* to be controlling. Assuming that the facts in *Local 580* and in *Local 519* here are substantially the same, I must disagree with the district court decision in *Local 580* on October 19, 1977, for the reasons I have stated.

I have been advised of an unreported memorandum and order by the United States District Court for the Northern District of Kentucky in *Transit Authority of Louisville and Jefferson County v. Amalgamated Transit Union*, N. C 76–0535–L(B), entered April 20, 1977. There the transit authority filed suit in state court seeking to enjoin a grievance arbitration proceeding demanded by the union. The union removed the action to the federal district court pursuant to 28 U.S.C. § 1441(b) and § 1331(a). Remanding the case to state court, the federal district court found no clear demonstration that federal law is dispositive of the action. Instead, it viewed plaintiff's reference to federal law in its complaint as "nothing more than an anticipation of a possible defense." As such, the court concluded, "it is an insufficient peg upon which to hang removal jurisdiction." *Id.* at 3. The memorandum opinion is too cursory to permit effective comparison to the facts of the instant case.

In *Local Division 1285 v. Jackson Transit Authority*, No. C–76–104–E, decided December 23, 1977, and also unreported as yet, the United States District Court for the Western District of Tennessee dismissed a complaint by the union against the city for breach of a § 13(c) contract. Rejecting the union's contention that a breach of the statutorily-required contract must be treated as a breach of the UMTA itself, the court found there was no federal question jurisdiction. The validity of this conclusion is difficult to assess from the opinion; there is no discussion concerning the nature of the alleged violation, the circumstances under which the 13(c) agreement was entered, or the prior history of labor-management relations between the parties. Thus it is impossible to determine whether the complaint in *Division 1285* actually raised a claim "arising under" the UMTA as I have discussed that concept in this opinion.

### ORDER

It is ordered that:

1. Defendants' motion for an order dismissing this action for lack of subject matter jurisdiction is denied.

2. Defendants' motion, in the alternative, that the court abstain from exercise of its subject matter jurisdiction, if such jurisdiction exists, is denied.

3. The preliminary injunction entered herein August 31, 1977, is stayed until noon on February 14, 1978. Applications for any further stays are to be addressed to the Court of Appeals.